**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

DEC 0 7 2021

TAMMY H. DOWNS, CLERK
By: _Rhayo_____
DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

| | | |
|---|---|---|
| C.W. AND B.W., Individually and as PArent and Next Friend of D.R., | § § § § § | |
| Plaintiffs | § § | |
| v. | § § | CASE NO. 2:21-cv-163-BSM |
| PALESTINE-WHEATLEY SCHOOL DISTRICT, | § § § § | This case assigned to District Judge Miller and to Magistrate Judge Ray |
| Defendant | § § | |
| JOHN ESTES, Individually, | § § § | |
| Defendant | § | |

---

## COMPLAINT

---

C.W. and B.W., Individually and as Parents and Next Friend of D.R., for

their Complaint state:

## I. PARTIES

1.      D.R., age 10, is a child with a disability as defined by the Individual

with Disabilities Education Act ("IDEA"), 20 U.S.C. §1401(3)(A)(i). D.R. has

Cerebral Palsy. She walks using a walker. D.R. has significant issues using

the left side of her body that cause difficulty with simple tasks such as

holding a sheet of paper with one hand and writing with the other. She

requires occupational therapy and physical therapy to access her

educational program. **Exhibit A, p. 24**.

2.      C.W. is the biological mother of D.R.

3.      B.W. is the biological grandmother of D.R. D.R. lives with B.W., and

B.W. acts as D.R.'s primary caregiver. This makes B.W. D.R.'s "parent" as

defined by the IDEA. *See* 20 U.S.C. §1401(23)(C).

4.      Accordingly, C.W. and B.W. will be collectively referred to as

"Parents."

5.      B.W. and D.R. reside in Lee County or St. Francis County, Arkansas.

6.      The Palestine-Wheatley School District ("PWSD") is an Arkansas

school district and a public corporation that may be sued in its own name.

*See* Ark. Code Ann. §6-13-102(a). Arkansas school districts are not state

agencies immune from suit pursuant to the Eleventh Amendment. *See*

*Herts v. Smith*, 345 F.3d 581, 588 (8th Cir. 2003).

7.     Jon Estes is PWSD's Superintendent and is sued in his individual

capacity.

8.     Plaintiffs assert three claims. First, Parents seek to recover their

attorneys' fees and costs as the prevailing party in proceedings under the

IDEA. *See* 20 U.S.C. §1415(i)(3)(B)(i).

9.     Second, Parents and D.R. seek to recover compensatory damages

pursuant to §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a)

("§504"), and Title II of the Americans' with Disabilities Act, 42 U.S.C.

§12131-12165 ("Title II") for disability discrimination because PWSD acted

in bad faith by being deliberately indifferent to D.R.'s rights under the

IDEA, §504, and Title II and because PWSD retaliated against Parents and

D.R.

10.     Finally, Parents and D.R. seek to recover compensatory and punitive

damages from Estes for retaliating against Parents and D.R. in violation of

the First and Fifth Amendments of the U.S. Constitution.

## II.  JURISDICTION AND VENUE

11.     This Court has jurisdiction over Parents' IDEA fee claim pursuant to

20 U.S.C. §1415(i)(3)(A).

12.     This Court has jurisdiction to award Parents and D.R. compensatory

damages for disability discrimination, including retaliation, pursuant to 28

U.S.C. §1331, 28 U.S.C. §1343(a), §504, and/or Title II.

13.     This Court has jurisdiction to award Parents and D.R. compensatory

and punitive damages for Estes's First Amendment retaliation pursuant to

28 U.S.C. §1331, 28 U.S.C. §1343(a), and/or 42 U.S.C. §1983.

14.     This Court is the proper venue for Plaintiffs' claims. *See* 28 U.S.C.

§1391(b). Parents and D.R. reside in Lee County, Arkansas. PWSD is

located in St. Francis County. The events giving rise to Plaintiffs'

Complaint occurred in St. Francis County. Lee and St. Francis counties are

in the Eastern District of Arkansas, Delta Division. *See* 28 U.S.C. §83(a)(2).

## III.  STATEMENT OF FACTS

15.     On April 14, 2021, Parents filed a due process complaint with the

Arkansas Department of Education ("ADE") alleging PWSD denied D.R. a

free appropriate public education ("FAPE") in the least-restrictive environment ("LRE") in violation of the IDEA.

16.     ADE numbered Parents' due process complaint as H-21-32 and assigned the case to an impartial due process hearing officer ("HO").

17.     The HO conducted a due process hearing over four days starting June 23, 2021 and ending on June 30, 2021. Ten witnesses testified at the hearing. Parents submitted two volumes of exhibits totaling 528 pages. PWSD submitted three volumes of exhibits totaling 940 pages.

18.     On August 16, 2021, the HO issued her Final Decision and Order in H-21-32 finding that PWSD denied D.R. a FAPE from August 19, 2019, to April 15, 2021. The HO's decision in H-20-32 (redacted) is attached hereto as **Exhibit A** and incorporated by reference pursuant to Rule 10(c) of the Federal Rules of Civil Procedure.

19.     The HO found that PWSD violated D.R.'s clearly established rights under the IDEA, §504, and Title II.

20.     First, PWSD acted with deliberate indifference to D.R.'s right to access the playground at school. The HO included in her opinion the following exchange:

5

Q by attorney: There has been testimony that there is no access for [D.R.] to the playground. Is that accurate?

A by Principal Wilson: Yes.

Q by attorney: Okay. And why is that, that there is no access? In 2021 for a kid that has got a walker, that there is no access?

A by Principal Wilson: I can't answer that.

**Exhibit A, p. 20 (citing Tr. H-21-32, Vol. IV, p. 19)**.

21.     Estes admitted that Parents complained about D.R. *not* having access to the playground in 2017 and being required to sit on the ground and watch her peers play at recess. Rather than making the playground accessible, Estes provided D.R. with a place to sit so she would not have to sit on the ground. *See* **Exhibit A, pp. 20-21**.

22.     Second, PWSD acted with deliberate indifference to D.R.'s right to receive related services in conformity with her Individualized Education Program ("IEP"). *See* 20 U.S.C. §1401(9) (definition of FAPE).

23.     During the 2019-2020 school year, PWSD denied D.R. approximately 11 hours of occupational therapy and 27 hours of physical therapy. The HO found this violated the IDEA. **Exhibit A, p. 21**.

24.     During the 2020-2021 school year, PWSD denied D.R.

approximately 5.5 hours of occupational therapy and 13 hours of physical

therapy. The HO found this violated the IDEA. **Exhibit A, p. 22**.

25.     The HO concluded PWSD's failure to provide D.R. therapy in

conformity with her IEP resulted in "a substantive violation of FAPE"

because D.R's "physical access to her entire program rest with the positive

results occupational therapy and physical therapy can provide." **Exhibit A,**

**p. 25**.

26.     The HO ordered PWSD to take the following actions:

1. District is ordered to provide Student compensatory education in
the amount of 40 hours or 2400 minutes of physical therapy and
16.5 hours or 990 minutes of occupational therapy. The minutes of
therapy will be spread over time and agreeable to the District and
Parent, taking into account Student's ability to endure additional
therapies. The therapy minutes ordered will be carried forward on
Student's IEP until completed.

2. District is ordered to hold an IEP meeting within 30 days of this
decision to develop an appropriate IEP for Student. The District LEA
must be present. The IEP team must discuss Student's access to
District's campus and nonacademic activities, including but not
limited to recess. The IEP team must consider supplementary aids
and services that may be appropriate and necessary to afford
Student an equal opportunity to participate in extracurricular and
nonacademic activities and document those decisions on Student's
IEP. The IEP team must also determine if additional evaluations are
necessary in order to develop an appropriate program for Student.

3. For the 2021-2022 school year the District shall hold quarterly IEP meetings to review Student's progress. District shall ensure the necessary participants attend Student's IEP meetings. When discussing academic/nonacademic services that involve Occupational therapy and/or Physical therapy services, the District shall ensure that the occupational therapist and the physical therapist attend the IEP meeting.

**Exhibit A, pp. 25-26**.

## IV.  CLAIMS

## COUNT I

## IDEA ATTORNEYS' FEES AND COSTS

27.     Parents are the prevailing party in a proceeding under the IDEA and may be awarded reasonable attorneys' fees and costs. *See* 20 U.S.C. §1415(i)(3)(B)(i).

28.     PWSD had 90 days to appeal the HO's decision in H-21-32. *See* 20 U.S.C. §1415(i)(2)(B) (90 days to appeal). PWSD's time to appeal ran on November 16, 2021. PWSD did not file an appeal, and as a result, the HO's decision is now a final judgment for purposes of the doctrines of the law of the case, issue preclusion, and claim preclusion.

29.     The IDEA does not establish a limitations period for an IDEA

fee claim. *See* 20 U.S.C. §1415(i)(3). The Eighth Circuit has

established a 90-day limitations period that starts when the losing

party's time to appeal runs out, or 180 days from the HO's decision.

*See Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 875-76 (8th Cir.

2020), cert. denied, 141 S. Ct. 2851 (2021); 20 U.S.C. §1415(i)(2)(B)

(90 days to appeal). February 12, 2022 is 180 days from the HO's

decision. Accordingly, Parents' IDEA fee claim is timely.

30.     This Court must give the HO's decision the same preclusive

effect that it would be entitled to in Arkansas courts because the

HO was acting in a judicial capacity, the questions litigated were

properly before the HO, and the parties had an adequate

opportunity to litigate them. *See Univ. of Tennessee v. Elliott*, 478

U.S. 788, 799 (1986); *Plough v. West Des Moines Community

School Dist.*, 70 F.3d 512, 515–16 (8th Cir.1995).

31.     ADE's rules establish that the HO acted in a judicial capacity.

For example, the rules define "hearing officer" as "an impartial,

trained individual assigned by [ADE], Special Education Unit, for the

purpose of presiding at a due process hearing or expedited due

process hearing." ADE Spec. Ed. Rules §10.01.21.1. *See* 20 U.S.C. §1415(f)(3)(a) (minimum qualifications for hearing officers). The rules ultimately require hearing officers to produce a "written judgment" including "findings of fact," and "the decision(s)" and "orders resulting from the hearing decision." ADE Spec. Ed. Rules, §10.01.39.2. *See* 20 U.S.C. §1415(h)(4) (requiring written findings of fact and decisions). Therefore, the HO clearly acted in a judicial capacity.

32.     ADE rules also make clear that the questions litigated were properly before the HO. The rules grant hearing officers authority:

[T]o rule on any matter that pertains to the identification, evaluation or educational placement of a child with a disability, and the provision of a free appropriate public education to the child within the meaning of the IDEA and Ark. Code Ann. 6-41-202, *et seq.*

ADE Spec. Ed. Rules §10.01.22.1. Notably, PWSD did not challenge to the HO's jurisdiction. The HO's decision outlines the questions litigated, and those questions clearly fall within the HO's broad jurisdiction to ensure IDEA compliance. **Exhibit A, p. 2**. Therefore, there can be no dispute that the questions litigated were properly before the HO.

10

33.    Finally, the parties had an adequate opportunity to litigate the questions presented. ADE's rules guaranteed the parties were afforded due process. They provide:

Any party to a hearing under these procedures has the right to –

A. Be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities;

B. Present evidence and confront, cross-examine, and compel the attendance of witnesses;

C. Prohibit the introduction of any evidence at the hearing that has not been disclosed to that party at least five (5) business days before the hearing;

D. Obtain a written, or, at the option of the parents, electronic, verbatim record of the hearing; and

E. Obtain written, or, at the option of the parents, electronic findings of fact and decisions.

ADE Spec. Ed. Rules 10.01.14.1. At the hearings, the HO allowed PWSD to present all the evidence it wanted, to call all the witnesses it wanted, to cross-examine Parents' witnesses, and to submit a post-hearing brief before the HO ruled. Moreover, the HO placed the burden proof on Parents. **Exhibit A, p. 14**. Consequently, there can be no doubt that PWSD had an adequate opportunity to litigate the questions presented.

11

34.     Therefore, this Court must give the HO's decision the same

preclusive effect that a state court would. In Arkansas, an unreviewed

administrative decisions may be given preclusive effect in later

proceedings. *Alexander v. Pathfinder, Inc.*, 91 F.3d 59, 62 (8th Cir. 1996)

(citing *Pine Bluff Warehouse v. Berry*, 51 Ark.App. 139, 142, 912 S.W.2d

11, 13 (1995)). "In Arkansas, issue preclusion bars relitigation of an issue of

law or fact that was litigated in the first suit when the issue sought to be

precluded is the same as that involved in the prior litigation, was actually

litigated, determined by a valid and final judgment, and its determination

was essential to the judgment." *Id.* (citing *Crockett & Brown, P.A. v.*

*Wilson*, 314 Ark. 578, 581, 864 S.W.2d 244, 246 (1993)).

35.     Applying Arkansas law, issue preclusion bars PWSD from relitigating

whether it denied D.R. a FAPE from August 19, 2019, to April 15, 2021.

That issue was actually litigated before the HO. ASD did not appeal the

HO's decision, and as a result, it is now a final judgment. *Alexander*, 91

F.3d at 62 ("Under Arkansas law, an unappealed administrative decision is

a final judgment.") (citing *Pine Bluff Warehouse v. Berry*, 51 Ark.App. 139,

142, 912 S.W.2d 11, 13 (1995)). Finally, the HO's finding that PWSD

12

denied D.R. a FAPE was essential to the judgment. Accordingly, issue preclusion applies, and PWSD cannot relitigate whether it denied D.R. a FAPE from August 19, 2019, to April 15, 2021.

36.    The Court may reach the same result applying the law of the case doctrine. "'[A] decision in a prior appeal is followed in later proceedings unless a party introduces substantially different evidence, or the prior decision is clearly erroneous and works a manifest injustice.'" *United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir.1995) (quoting *United States v. Callaway*, 972 F.2d 904, 905 (8th Cir.1992) (per curiam)). PWSD cannot establish that the HO's decision was clearly erroneous or that application of the law of the case doctrine would work a manifest injustice. When PWSD decided not to appeal the HO's decision, it was conceding that it denied D.R. a FAPE from August 19, 2019, to April 15, 2021. Therefore, the law of the case doctrine also bars PWSD from relitigating that issue.

37.    Parents will submit a properly supported motion for summary judgment on their IDEA fee claim consistent with the Court's scheduling order.

## COUNT II

## §504/TITLE II DISABILITY DISCRIMINATION

38.    The enforcement, remedies, and rights are the same under §504 and Title II. *Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir.2000).

39.    D.R. is a qualified individual with a disability.

40.    PWSD is a public entity receiving federal funds.

41.    PWSD discriminated against D.R. solely on the basis of his disability.

42.    PWSD harmed D.R. by departing so substantially from accepted professional judgment, practice or standards as to demonstrate that the PWSD acted with wrongful intent.

43.    PWSD's decision to pursue a course of action knowing it would likely result in a violation of D.R.'s federally protected rights creates an inference that the District acted with deliberate indifferent. *See Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).

44.    Since 2017, PWSD has known that D.R. was being denied access to the playground in violation her clearly established rights pursuant to the IDEA, §504, and Title II, but PWSD failed and refused to provide D.R. access to the playground.

14

45.     "Congress sought primarily to make public education available to handicapped children" and "to make such access meaningful." *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 192, 102 S.Ct. 3034, 3043, 73 L.Ed.2d 690 (1982). Accordingly, the IDEA "makes specific provision for services, like transportation, for example, that do no more than enable a child to be physically present in class . . . ; and the [IDEA] specifically authorizes grants for schools to alter buildings and equipment to make them accessible to the handicapped." *Irving Ind. Sch. Dist. v. Tatro*, 468 U.S. 883, 891 (1984) (citing 20 U.S.C. §1406; see S.Rep. No. 94–168, p. 38 (1975), U.S.Code Cong. & Admin.News 1975, p. 1425; 121 Cong.Rec. 19483–19484 (1975) (remarks of Sen. Stafford)).

46.     Pursuant to the IDEA, ADE developed "Program Standards" for school district in Arkansas. ADE's program standards for academic facilities provide:

17.01.1.1 Barriers that limit child[rens'] access to special education services must be eliminated.

17.01.1.2 Toilet areas, building and classroom entrances, etc., must conform to specifications for the accessibility of individuals with

disabilities in conformance with the Americans with Disabilities Act, Public Law 101-336.

17.01.1.3 Classrooms should be located within an age-appropriate school building, which houses classrooms for nondisabled peers of children with disabilities.

ADE Spec. Ed. Rules, §17.01 Academic Facilities.

47.    Three provisions of the IDEA work to together to ensure that

disabled children have access to nondisabled peers: the least-restrictive

environment ("LRE") requirement, the IEP requirement, and the

transportation requirement.

48.    First, the LRE requirement provides:

To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of *supplementary aids and services* cannot be achieved satisfactorily.

20 U.S.C. §1412(a)(5) (emphasis supplied).

49.    The IDEA defines "supplemental aids and services" means:

*[A]ids, services, and other supports* that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children

16

to the maximum extent appropriate in accordance with Section 1412(a)(5) of this title.

20 U.S.C. §1401(33) (emphasis supplied).

50.     Therefore, the LRE requires school districts to provide the aids,

services, and other supports necessary for a disabled child to access

nondisabled peers.

51.     Second, the IDEA requires the IEP include:

[A] statement of . . . how the child's disability affects the child's involvement in and progress in the general education curriculum. §1414(d)(1)(A)(i)(I)(aa);

[A] statement of measurable annual goals . . . designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum. §1414(d)(1)(A)(i)(II)(aa);

[A] statement of measurable annual goals . . . designed to meet each of the child's other educational needs that result from the child's disability. §1414(d)(1)(A)(i)(II)(aa);

[A] statement of the special education and related services and **supplementary aids and services** . . .to be provided to the child, or on behalf of the child . . . to be involved in and make progress in the general education curriculum . . .  and to participate in extracurricular and other nonacademic activities; and to be educated and participate with other children with disabilities **and nondisabled children** . . . . §1414(d)(1)(A)(i)(IV)(bb), (cc);

[A] statement of the **program modifications or supports** for school personnel that will be provided for the child to be involved in and

17

make progress in the general education curriculum . . .  and to
participate in extracurricular and other nonacademic activities; and
to be educated and participate with other children with disabilities
***and nondisabled children*** . . . . §1414(d)(1)(A)(i)(IV)(bb), (cc).
(emphasis supplied). Therefore, the IEP must include the aids, services,

modifications, and supports necessary for a disabled child to access nondisabled

peers.

52.     In sum, the LRE requirement and the IEP requirement together

require school districts to "take[] steps to accommodate the handicapped

child in regular education," and if a school district fails to do so, it "is in

violation of the [IDEA's] express mandate to supplement and modify

regular education." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1013

(5th Cir. 2010).

53.     Consistent with the IDEA, ADE's special education rules provide:

17.02.1.1 Each public agency shall ensure that –

A. To the maximum extent appropriate, children with
disabilities, including children in public or private
institutions or other care facilities, are educated with
children who are nondisabled; and

B. Special classes, separate schooling, or other removal
of children with disabilities from the regular educational
environment occurs only if the nature or severity of the
disability is such that education in regular classes with

18

the use of supplementary aids and services cannot be achieved satisfactorily.

17.02.1.2 Determination of least restrictive environment is made on an individual basis, taking into account both service(s) needed and the placement in which the child's IEP can be implemented appropriately.

17.02.2 Continuum of alternative placements.

17.02.2.1 Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services.

ADE Spec. Ed. Rules, §17.02 Least Restrictive Environment.

54.     ADE rules make clear that the LRE requirement also applies in

nonacademic settings. The LRE rules provide:

In providing or arranging for the provision of nonacademic and extracurricular services and activities, ***including meals, recess periods***, and the services and activities set forth in 34 CFR 300.107, each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child. ***The public agency must ensure that each child with a disability has the supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings***.

ADE Spec. Ed. Rules, §13.04 (emphasis supplied). Moreover, ADE rules prohibit

removing a disabled child from the regular classroom "solely because of needed

modifications in the general education classroom." ADE Spec. Ed. Rules, §13.03.5.

55.     Finally, IDEA broadly defines "transportation" to ensure disabled children access to regular education classroom and nondisabled peers.

56.     Transportation is a related service under the IDEA. *See* 20 U.S.C. §1401(26)(A). Federal rules define transportation to include:

(i) Travel to and from school and between schools;

(ii) Travel in and around school buildings; and

(iii) Specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability.

34 C.F.R. §300.34. Therefore, the IDEA required PWSD to provide D.R. transportation "in and around school buildings," including any needed "[s]pecialized equipment." *See* 34 C.F.R. §300.34.

57.     Interpreting "in and around school buildings" consistent with the LRE requirement, the District was required to provide D.R. transportation to and from "nonacademic and extracurricular services and activities, including meals, recess periods," *see* ADE Spec. Ed. Rules, §13.04.

58.     Therefore, the IDEA required PWSD to provide D.R. transportation

20

to the playground equipment so she could have access to her nondisabled peers. Moreover, PWSD must provide a transportation aide if necessary for D.R. to receive a FAPE in the LRE. *See D.C. v. Ramirez*, 377 F. Supp. 2d 63, 68 (D.D.C. 2005) ("By denying C.G–R. a transportation aide, then, plaintiff falls short of the IDEA's requirement that it provide C.G–R. a free appropriate public education, as guaranteed by 20 U.S.C. § 1400(d)(1)(A).").

59.    PWSD's conduct also violated D.R.'s clearly established rights pursuant to §504 and Title II. PWSD violated §504's regulations, 34 C.F.R. §104.21, that provides, "No qualified handicapped person shall, because a recipient's facilities are inaccessible to or unusable by handicapped persons, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity to which this part applies." Moreover, PWSD's FAPE denial also violated §504. *See* 34 C.F.R. §104.33 (requiring a FAPE). *See also* 34 C.F.R. §104.37 (requiring "equal opportunity" to participate in "non-academic and extracurricular services and activities"); 34 C.F.R. §104.43 (prohibiting exclusion from "recreation").

60.     Similarly, PWSD violated Title II's regulations, 28 C.F.R. §35.149 that

provides, "[N]o qualified individual with a disability shall, because a public

entity's facilities are inaccessible to or unusable by individuals with

disabilities, be excluded from participation in, or be denied the benefits of

the services, programs, or activities of a public entity, or be subjected to

discrimination by any public entity."

61.     Retaliation is prohibited disability discrimination. *Jackson v.*

*Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) ("Retaliation is,

by definition, an intentional act. It is a form of 'discrimination' because

the complainant is being subjected to differential treatment.").

62.     Retaliation is also prohibited by §504 and Title II rules. *See* 28

CFR § 35.134 (Title II); 34 CFR §104.61 (§504 - incorporates Title VI

regs); 34 CFR §100.7(e) (Title VI).

63.     Parents engaged in protected activity by advocating for D.R.'s

rights under the IDEA and §504/Title II in good faith.

64.     PWSD took adverse action against Parents and D.R. for their

protected activity. Specifically, PWSD prohibited B.W. from parking in

the designated handicapped parking space when dropping D.R. off at

school at the start of the 2020-2021 school year.

65.     Instead, PWSD ordered B.W. to park in a designated handicapped parking space in front of the Superintendent's Office requiring B.W. and D.R. to navigate a cracked, unlevel sidewalk to access school.

66.     On the first day of school, B.W. parked in front of the Superintendent's office, exited the vehicle, and then assisted D.R. exit the vehicle. D.R., leery of the long walk on her walker, asked B.W. to push her in the walker. As B.W. pushed D.R. over the cracked, unlevel sidewalk, she tripped and fell ending up on top of D.R.

67.     While neither was seriously injured, both were sore and bruised by the fall. Immediately after the fall, they were too agitated and embarrassed to assess their injuries. B.W. knew she jammed her finger, but otherwise just wanted to move on. However, for days after the fall, B.W. had visible bruises on her knees, and both were achy and sore.

68.     On the following Monday, the Principal called B.W. and asked her to come the school for a meeting. B.W. complied. When B.W. entered the Principal's office, she expected an apology, but instead, the Principal

lamented that she had been "jeered" by B.W.'s "fan club." Apparently, after B.W.'s fall, other parents observing the absurdity of the situation verbally berated the Principal.

69.     In the end, the Principal refused B.W.'s demand that she be allowed to park in the designated handicapped parking space in front of the school.

70.     B.W. appealed to the Superintendent, Estes. As a part of her appeal, B.W. showed Estes her bruised knees from her fall with D.R. Estes did not apologize, but instead, he sneered at Betty and said, "I'll call my lawyer." That was the end of their conversation. Estes ratified the decision of the Principal.

71.     The Principal's ultimately allowed B.W. to stop in the designated handicapped parking space while school employee's rush D.R. out of the vehicle.

72.     The Principal's solution is unacceptable to B.W. because she has a **_right_** to park in a designated handicapped parking space, and neither the Principal nor PWSD can take that right away for their own convenience.

73.     Moreover, allowing B.W. to park, help Darla exit the vehicle, and walk Darla into school better respects D.R.'s dignity, provides a more gradual transition into the school day, and allows them time to talk and make plans for during- or after-school activities. This routine gets D.R.'s day off to a good start.

74.     In contrast, PWSD personnel have been told to get D.R. out quickly to keep traffic moving. As soon as B.W. stops, they jerk the door open, grab D.R. and rush her out of the car in a fashion that causes D.R. to feel anxious and embarrassed by the resulting scene. This new routine meant every day got off to a bad start.

75.     Even if Plaintiffs general disability discrimination claim fails, Plaintiffs can still prevail based on retaliation if they engaged in protected activity in good faith. *See Rinehart v. Weitzell*, 964 F.3d 684, 689 (8th Cir. 2020). For example, even if the law allowed PWSD to prohibit B.W. from parking in the designated parking space in front of the school, PWSD cannot retaliate against B.W. for demanding to be allowed to park in that space because the demand was made in good faith.

25

76.    A causal connection exists between Parents' protected activity

and the adverse action taken by PWSD.

77.    Parents, individually, are "person[s] aggrieved" and have standing

to pursue a §504/Title II discrimination claim based on the PWSD's

disability discrimination against D.R. described herein. *See* 29 U.S.C.

§794a(a)(2) ("The remedies, procedures, and rights . . . shall be available

to any person aggrieved by any act or failure to act by any recipient of

Federal assistance or Federal provider of such assistance . . . "); 42

U.S.C. § 12133 (incorporating §794a); *K.F. v. Francis Howell R-III Sch.*

*Dist.*, No. 4:07CV01691 ERW, 2008 WL 723751, at *7 (E.D. Mo. Mar. 17,

2008) ("This Court is persuaded by the reasoning in *Blanchard* and

*C.J.G.*, and finds that parents do have standing under Section 504 and

the ADA as an aggrieved party in their own right.") (following *Blanchard*

*v. Morton Sch. Dist.*, 509 F.3d 934 (9th Cir. 2007) and *C.J.G. v. Scranton*

*Sch. Dist.*, 2007 WL 4269816 at *5-6 (M.D. Pa. Dec. 3, 2007)).

78.    As a direct and proximate result of the PWSD's bad faith/

deliberate indifference and/or retaliation, Parents and D.R. have

incurred and will incur in the future non-pecuniary losses for which they

should be compensated.

79.     Parents and D.R. have suffered non-pecuniary losses in the form

of past and future emotional pain, suffering, inconvenience, mental

anguish and loss of enjoyment of life.

80.     Parents respectfully requests compensatory damages for Parents'

and D.R.'s non-pecuniary losses in an amount determined by a jury.

## COUNT III

## FIRST AMENDMENT RETALIATION

1.      Parents, individually and on behalf of D.R., seek relief pursuant to 42

U.S.C. §1983, from Estes, individually, for his retaliation against Parents

and D.R. in violation of their rights under the First and Fifth Amendments

of the U.S. Constitution.

2.      Parents engaged in protected activity by advocating for D.R.'s rights

under the IDEA and §504/Title II.

3.      Estes took adverse action against Parents and D.R. as described

above.

4.      Parents' protected activity was a motivating factor in Estes' decision

to take adverse action against Parents and D.R.

5.   At all relevant times, Estes acted under color of state law.

6.   As a direct and proximate result of the Estes' First Amendment retaliation, Parents and D.R. have incurred and will incur in the future non-pecuniary losses for which they should be compensated.

7.   Parents and D.R. has suffered non-pecuniary losses in the form of past and future emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

8.   Parents respectfully requests compensatory damages for Parents' and D.R.'s non-pecuniary losses in an amount determined by a jury.

9.   Estes' conduct in this case was motivated by evil motive or intent and/or involved reckless or callous indifference to the federally protected rights of Parents and D.R., and accordingly, Parents and D.R. should be awarded punitive damages from Estes to punish Estes and to deter others from engaging in similar behavior.

## V.  JURY DEMAND

10.   Plaintiffs demand a jury trial on Counts II and III.

WHEREFORE, Plaintiffs pray that Parents be awarded their attorneys' fees and costs and the prevailing party in proceedings under the IDEA; that Parents

and D.R. be awarded compensatory damages from PWSD for disability

discrimination generally and retaliation in an amount determined by a jury; that

Parents and D.R. be awarded compensatory and punitive damages from Estes

for First Amendment Retaliation in an amount determined by a jury; and, that

Plaintiffs be awarded all other just and proper relief to which they may be

entitled.

Respectfully submitted,

Theresa L. Caldwell
Arkansas Bar Number 91163
Attorney for Plaintiffs
CALDWELL LAW OFFICE
14 Alban Lane
Little Rock, Arkansas 72223
Tel.: 501-414-0434
E-mail: tlcatty@gmail.com

<u>**Arkansas Department of Education**</u>

<u>**Special Education Unit**</u>

**XXXXXXXXXX
AS PARENT OF
XXXXXXXXXX**

**PETITIONER**

**VS.**            **Case No. H-21-32**

**PALESTINE-WHEATLEY SCHOOL
DISTRICT**                    **RESPONDENT**

<u>**HEARING OFFICERS FINAL DECISION AND ORDER**</u>

1

**ISSUES PRESENTED:**

Whether the Palestine Wheatley School District (hereinafter "District" or "Respondent") denied XXXXX (hereinafter "Student") a free, appropriate, public education (hereinafter "FAPE"), between August 19, 2019 and April 15, 2021 in violation of certain procedural and substantive requirements of the Individuals with Disabilities Education Act of 2004, 20 U.S.C. 1400-1485, as amended (hereinafter referred to as "IDEA"), by:  (1) denying Student access to the designated handicapped parking space closest to the school entrance; (2) denying Student access to the school's playground during recess; and (3) failing to provide all necessary occupational therapy and physical therapy minutes pursuant to Student's 2019-2020 and 2020-2021 IEPs.

**Procedural History:**

On April 14, 2021, the Arkansas Department of Education (hereinafter referred to as the "Department") received a request to initiate a due process hearing from XXXXXXX, Student's parent.  On April 15, 2021, Ms. XXXXXX filed an acknowledgement of educational representative with the Department, stating that XXXXXXXX meets the definition of Parent as defined by U.S.C. 1401(23), and that XXXXXXXX has been acting as the parent of XXXXXXXXXXX for several years with respect to parental IDEA rights.  Additionally, XXXXXXXX gave XXXXXXXX the right to represent her rights under IDEA, 20 U.S.C. 1415, specifically as it relates to this Due Process hearing.[1]  XXXXXX ("Parent" or "Petitioner") is the biological grandparent of XXXXXXXX(hereinafter referred to as "Student") against the Palestine Wheatley School District (hereinafter referred to as "District" or "Respondent").  Parent requested the hearing because she believed the District failed to comply with the Individuals with Disabilities Education Act of 2004, 20 U.S.C. 1400-1485, as amended

---

[1] See Due Process hearing file acknowledgment.

Exhibit A to Complaint

(hereinafter referred to as "IDEA") and the regulations set forth by the Department by not providing Student with appropriate special education services, as noted supra in the statement of issues. [2]   At the time that Parent filed her request for a due process hearing, Student was a 9-year-old girl in the third grade, specifically enrolled in Palestine-Wheatley School District. [3]   Student was a student with a disability under IDEA.  Student was diagnosed with Cerebral Palsy and categorically identified under other health impairment. [4]

In response to the Parent's request for a Due Process hearing, the Department assigned the case to an impartial hearing officer.  Thereafter, a prehearing conference was scheduled for May 21, 2021, and the hearing was scheduled for May 25-27, 2021.   The day after this Due Process hearing was scheduled for May 25-27, 2021, Petitioner notified the hearing officer that she had forgotten she had another due process hearing scheduled for May 25, 2021 and asked the hearing be rescheduled.  Respondent agreed to the date change and both parties sent available dates to the hearing officer.  Whereupon this hearing officer sent an amended scheduling order rescheduling the hearing for June 2-4, 2021. [5]   On May 25, 2021, Mr. Kees, attorney for the District sent the hearing officer an email stating it was a joint motion for a continuance.  At this time the two attorneys in this case had two separate due process hearing requests involving the Palestine Wheatley School District.  The attorneys asked that the hearing officer to move H-21-27/H-21-37 to June 1-3, 2021 and grant a continuance in this Due Process Hearing.  The hearing officer granted the continuance and rescheduled the prehearing conference for June 21, 2021, and the Due Process hearing for June 23-24, 2021.

---

[2] See hearing officer File-Petitioner Complaint.
[3] See Hearing officer File-Petitioner Complaint, pg. 2.
[4] See Hearing officer file-Petitioner Complaint.
[5] Id.

3

Exhibit A to Complaint

A prehearing conference was conducted, via zoom, on June 21, 2021.[6]  Counsel for both the Parent and the District participated in the prehearing conference.

Thereafter the Due Process hearing in this matter began as scheduled on June 23, 2021. Testimony was heard in this case at the Palestine Wheatley elementary school on June 23rd and 24th, 2021, all parties by zoom on June 25th, 2021, at which time a continuance was granted to complete testimony in this case on June 30, 2021 at the Hampton Inn in Forest City, Arkansas.

Present for the Hearing were Theresa Caldwell, attorney for Petitioner, Cody Kees, Attorney for the District, XXXXXXXXX, parent, Lori Ginn, LEA, Audra Alumbaugh, advocate, and Cheryl Reinhart observed as a newly hired hearing officer by the Department.

The following witnesses testified in this matter:  Mary Oltmannn, Bryan Southerland, Kristian Moore, Jennifer Rowan, Hannah Crafton, Lori Ginn, Shannon Heard (by zoom), Kristi Wilson, Jon Estes, and XXXXXXX.

 Having been given jurisdiction and authority to conduct the hearing pursuant to Public Law 108-446, as amended and Arkansas Code Annotated §6-41-202 through §6-41-223, Dana McClain, J.D., Hearing Officer for the Arkansas Department of Education, conducted a closed impartial hearing.

Both parties were offered the opportunity to provide post-hearing briefs in lieu of closing statements, and both timely submitted briefs in accordance with the deadline set by this Hearing Officer. [7]

---

[6] First Pre-Hearing conference transcript.
[7] See Hearing Officer File-post hearing briefs.

4

Exhibit A to Complaint

**Findings of Fact**

1.  Student is a 10-year-old girl in the Palestine Wheatley School District.  Student was in the second grade during the 2019-2020 school year, the third grade during the 2020-2021 school and will be in the fourth grade during the 2021-2022 school year.[8]

2.  Student was first evaluated at four years old at the Monroe County Human Development Center ("MCDC").[9] Student showed significant developmental delays.[10] The Student's first IEP with the District was created in April 2017.[11] The IEP has been revised yearly since April 2017. The Student's relevant IEPs are those from the 2019-2020 and 2020-2021 school years.[12]

3.  Student is diagnosed with Cerebral Palsy and has qualified for special education services under IDEA since she began her school career.  She is qualified under the category of Other health impairment.

4.  Student requires a walker in order to ambulate around the school campus.

5.  March 5, 2019, a Physical Therapy Evaluation was conducted.  Evaluator concluded that Based on the findings, XXXX presents with significant delays in acquiring overall gross motor abilities.  Her overall standard deviation is -3.00.  Student scored well below average in each of her subtests and composites, however, this is to be expected given the nature of Student's diagnosis.  Based on Student's current scores, physical therapy treatment is indicated due to Student functioning at a poor level when compared to her peers and indicating that  severe deficits in coordination, balance, strength and agility are

---

[8] Parent's Exhibits, pgs. 1,13,46.
[9] District's Exhibits, pg. 505.
[10] Id.
[11] Parent's Exhibits, pg. 252.
[12] Id., pgs. 13, 46.

Exhibit A to Complaint

present.  These deficits affect Student's ability to excel in educational, social and

recreational settings.  These gross motor deficits increase difficulty in navigating the

school, participating physical classes and/or interaction during activities and recess.

Furthermore, these difficulties can lead to poor participation, poor social skill, low self

esteem and ridicule which can also directly affect Student's educational progress.  Based

on these standardized test scores and clinical observations/judgment and due to safety

concerns with functional mobility, pace of travel, integration and gait instability, physical

therapy services are indicated at this time.[13]

4.     On March 5, 2019, an Occupational Therapy Evaluation was conducted.  It was noted on

the evaluation that testing showed Student had poor fine motor skills, poor manual

dexterity/coordination skills, poor visual-motor skills, poor upper extremity

strength/coordination, easily fatigues, poor visual perception skills, poor bilateral

coordination and poor handwriting/efficiency needed to perform within the classroom.

The evaluator summarized the evaluation with the following:

> Reviewing overall scores on both standardized tests and observations, the
> Tester feels that XXXXX would benefit from continued occupational therapy
> Services at this time, to address delays with age appropriate fine motor,
> Dexterity, visual-perceptual, visual-motor/eye hand coordination, bilateral
> Strength/stability, and bilateral coordination skills, which are negatively
> Impacting her ability to perform successfully in her daily academic environment.
> She would benefit from continued direct, skilled occupational therapy services
> To address these delays. [14]

4.     On March 26, 2019, a psychological assessment was conducted.  Test administered

included:  Reynolds Intellectual Assessment Scales-2 (RIAS -2); Wechsler Individual

Achievement test-III (WIAT-III); Gray Oral Reading Test-Fifth Edition; Clinical

Evaluation of Language Fundamental-5-Screening Test (CELF-5), Test of Auditory

---

[13] District Exhibits, pgs. 270-273.
[14] District Exhibits, pgs. 264-268.

Exhibit A to Complaint

Processing Skills-3 (TAPS-3)-Word Discrimination subtest; Adaptive Behavior Rating

Scale and Burks Behavior Rating Scale-2.  Evaluator summary stated:

1.  xxxxx's measured intelligence on the RIAS-2 is in the Low Average range when compared to same aged peers.

2.  xxxxx's scores on the achievement tests are Below the expected level when compared with her measured abilities.

    -Reading: xxxxx's scores in Reading are in the Below Average range, which is Below the expected levels of her Low Average Intellectual abilities.

    -Math: xxxxx's scores in Math are in the Low Average range, which is At the expected levels of her Low Average Intellectual abilities.

    -Writing: xxxxx's scores in Spelling and Writing are in the Low Average range, which is At the expected levels of her Low Average Intellectual abilities.

3.  xxxxx passed the CELF-5 Speech and Language screening.

4.  xxxxx passed the auditory processing screening test.

5.  xxxxx receives Occupational Therapy.

6.  xxxxxx ratings on the ABES indicate Average to Low Average adaptive functioning skills.

7.  xxxxxx ratings on the BBRS-2 indicated elevated scales in Ability Deficits, Physical Deficits, and Weak Self-Confidence.[15]

4.     On April 16, 2019, the IEP team met to develop Student's IEP for the 2019-2020 school

year.  Participants at the IEP conference were Ms. Oltmann, special education teacher,

Cody Jackson, General education teacher, Lori Ginn, Local Education Agency

Representative and individual to interpret instructional implications of evaluation results,

and  XXXXXXX, parent.  Even though it appears from the evaluations conducted, the

physical therapist, the occupational therapist and the psychological examiner were not

present at any IEP meeting involved in this Due Process complaint. [16]

5.     Student's second grade (2019-2020) IEP included:

| Direct instruction Reading 50 Minutes | 5x weekly | SpEd Classroom |

---

[15] Id., at pgs. 259-263.
[16] Parent's Exhibits, pg. 46.

Exhibit A to Complaint

Direct instruction Language/spelling        50 minutes        5x weekly        SpEd Classrom

Direct instruction Mathematics        50 minutes        5x weekly        SpEd classroom

Related Services included:

Occupational Therapy        30 minutes        2x weekly        Therapy Room

Physical Therapy        60 minutes        2x weekly        Therapy Room

Under goals and objectives, the IEP stated:

Goal Area:        Indirect Student-Reading   3 goals for indirect services in reading, language arts, and
                  spelling.        Student mastered all three goals on 5/21/2020

Goal Area:        Mathematics        There was one goal        Student Mastered this goal on 5/21/20

Goal Area:        Factor Academic  There was one goal        Student Mastered this goal on 5/21/20

Goal Area:        Indirect Students: Spelling goal was on the IEP but was not initiated.

Goal Area:        Physical Therapy:        There were two goals and 10 objectives.  Student
                  mastered one objective.

Goal Area:        There were no occupational therapy goals documented in the IEP nor was
                  Student's progress in occupational therapy documented.

Under present level of academic achievement and functional performance, it is noted that that Student's
2019-2020 school year, her second-grade education will include: 750 minutes weekly in the resource room
for:  Mathematics-250 minutes weekly; Literacy-250 minutes weekly; reading-250 minutes weekly.
Additionally, Student will need extended school year for Physical Therapy and Occupational Therapy.[17]

6.        The IEP team met for Student's annual review on April 14, 2020.  Because of COVID
          19, the team met by phone.  They reviewed Student's progress and developed Student's
          third grade IEP (2020-2021 school year).  Participants listed on the IEP are XXXXXXX,
          Parent, Mary Oltmannn, special education teacher, local education agency representative,
          and individual to interpret instructional implications of Evaluation Results, and Shannon

---

[17] Parent Exhibits, pgs. 46-60.

Exhibit A to Complaint

Heard, general education teacher.  Again, no physical therapist, occupational therapist are present for this meeting.[18]

7.    Student's 2020-2021 IEP states that information taken from the 2019-2020 IEP says Student was receiving 310 minutes of academics in the special education classroom-30 minutes per week for reading and 250 minutes per week in mathematics, and 30 minutes per week in language and spelling.[19]  There is nothing in the record showing that there was a change in the 2019-2020 IEP from 750 minutes weekly to 310 minutes weekly in the resource room.  Student's 2020-2021 IEP included:

| Indirect services: | math   30 minutes 1x weekly | | regular classroom setting |
| Related Services: | Occupational therapy 30 minutes | 2x weekly | Therapy room |
| | Physical therapy        120 minutes | 1x weekly | Therapy room |

Under goals and objectives, the IEP stated:

Goal area        Physical development

Student will freely participate in gross motor activities while in therapy in the therapy room with 80% accuracy in the therapy room as measured by clinician data by the end of the school year and/or end of the therapy treatment plan of current evaluation.

There appear to be placement of two additional physical therapy goals with XXXX but nothing is stated in that area of Student's IEP.

Goal area:        Indirect Students-Mathematics

When given instruction and information, Student will demonstrate comprehension skills by answering questions and completing activities related to Math as measured with 70% accuracy by the end of the year.

Goal area:        Factor-Academic-activities /projects

When given classroom instruction concerning projects/activities, Student will demonstrate the ability to gather information pertaining to a class project and or activity and arrange it correctly with and without redirection as measured with 60% accuracy by the end of the school year.

---

[18] Id., at 13.
[19] Id., at 32.

Exhibit A to Complaint

7.  Student's ISTATION scores throughout her second-grade year were:  Reading-vocabulary-averaged Tier 2; Comprehension-averaged Tier 2 and Tier 3; Phonemic Awareness averaged Tier 2, Alphabetic decoding-Tier 2, spelling-averaged Tier 2, and Math-all scores were Tier 3.[20] Student's second grade teacher testified that Tier 2 was a warning line, a borderline that Student might need help and Tier 3 indicates that Student needs severe help.[21]  From the test scores Student was struggling but there were no IEP meetings held to discuss Student's deficits or modify programming.

8.  On September 14, 2020, there was an IEP amendment, which states that the amendment affected the cover sheet, modification page and the PLAAFP statement. However, there is nothing to indicate the specifics of the amendment.  It appears to not have made any significant changes in Student's 2019-2020 IEP.[22]

9.  During Students 2020-2021 third grade year, Student was given the Dibels, a series of short tests that assess K-8 literacy. It is a set of procedures and measures for assessing the acquisition of a set of K-8 literacy skills, such as phonemic awareness, alphabetic principle, accuracy, fluency, and comprehension benchmark assessment. Student scores were:

| Fall Screener scores | Mid Year Screener Scores | Spring Screener Scores |
|---|---|---|
| Dorf:  21 | Dorf: 55 | Dorf: 56 |
| Dorf/acc:54 | Dorf/acc:  97 | Dorf/Acc: 90 |
| DAZE:  2 | DAZE:  0 | DAZE:  1 |
|  |  |  |

---

[20] Parent's Exhibits, pg. 15.
[21] Trial Transcript Vol. III, pgs. 19-20.
[22] Parent's Exhibits, pgs. 44-45.

Exhibit A to Complaint

Student's scores on the Dibels indicate that Student needed intensive supports.[23] On the ISTATION given Student during 2020-2021 school year, Student scored Tier 3 in overall reading and text Fluency, as well as Tier 3 in overall Math.[24]  The data shows Student is continuing to fall further behind.  At some point during the 2020-2021 school year, Student began spending more time in the resource room with Ms. Oltmann, special education teacher.  However, that change is not noted on the IEP, nor were goals and objectives developed for subjects, Ms. Oltmann was teaching.  There is no way for this hearing officer to determine exactly what special education services Student was being provided during this time.

9.     Student's Grade report on June 4, 2021 showed Student's grades were steadily declining.

| Description | Bldg | Teacher | 9wk1 | 9wk2 | SEM1 | 9wk3 | 9wk4 | SEM2 | |
|---|---|---|---|---|---|---|---|---|---|
| language | 27 | Crafton | 65 | 79 | 72 | 53 | | | |
| Spelling | 27 | Crafton | 83 | 100 | 92 | 77 | 81 | 79 | |
| Reading | 27 | Crafton | 74 | 90 | 82 | 49 | | | |
| Math | 27 | Crafton | 70 | 65 | 68 | 44 | | | |
| Art | 27 | Weld | | | | | | | |
| Music | 27 | Rowan | | | | | | | |
| Science/ health | 27 | Crafton | 85 | 70 | 78 | 72 | 56 | 64 | |
| Social Studies | 27 | Crafton | 82 | 88 | 85 | 63 | 54 | 59 | |
| Physical activity | 27 | Sherland | | | | | | | |
| Language | 27 | Oltmann | | | | 94 | 83 | 89 | |
| Math | 27 | Oltmann | | | | 86 | 86 | 86 | |

---

[23] Id., at 479.
[24] Id., at 480-483.

Exhibit A to Complaint

| Reading | 27 | Oltmann | | | | 94 | 83 | 89 | |
|---------|----|---------|--|--|--|----|----|----|--|

[25]

10.   There is no discussion by the IEP team on either the 2019-2020 or 2020-2021 IEP regarding the need for parental parking when picking up and dropping Student off for school each day. Nor is there discussion on Student's access issues.

11.   There is no discussion by the IEP team on either the 2019-2020 or 2020-2021 IEP regarding Student's access to nonacademic services.

12.   There is no discussion by the IEP team on either the 2019-2020 or 2020-2021 IEP meeting regarding Student's access to the school campus, i.e., playground, cafeteria, gym, etc.

13.    During Student's time at Palestine Wheatley Elementary, Parent has parked in a designated handicapped parking space closest to Student's School door.[26]

14.   On the first day of Student's 2020-2021 school year the principal, informed Parent that because of safety concerns Parent would no longer be allowed to park in the designated handicapped parking space closest to the Student's school door.  Instead, Parent would need to park in the handicapped parking space in front of the superintendent's office which is a considerable distance from the elementary school Student attends.[27]

15.   It is undisputed throughout the testimony that the first day Parent parked in front of the Superintendent's office and walked down to pick Student up from school there was an accident.  As Student was physically tired from a day of school, she asked Parent to push her and allow her to sit on the seat attached to her walker.  Parent obliged, but at some

---

[25] Parent's Exhibits, pg. 484.
[26] Transcript, Vol. IV, p. 277.
[27] Id., at, pgs. 280-283.

Exhibit A to Complaint

point, the sidewalk was cracked and broken, and Parent and Student fell to the ground. And although not badly injured both were bruised and sore and red for a few days.[28]

16.   Parent asked the principal to reconsider and allow her to park in the designated handicapped parking space closest to the Student's school.  Principal declined.

17.   Ultimately, the District and Parent agreed that Parent would get in line where the other parents drop off their children and either a teacher or a paraprofessional would be there to assist Student out of the car and down the sidewalk to Student's school.

18.   Testimony by both Parent and the District showed that during Student's time at Palestine Wheatley elementary school Parent asked the District to provide something Student could access during recess because she was just sitting on the ground at the top of the hill. Student was unable to access the playground equipment unless someone carried her out to the playground swings.  The District did provide Student a picnic table to sit at with her friends during recess.  Further, there is no accessible route for Student to access the playground.  In order for Student to access the playground she has to traverse, on grass and dirt, an incline and according to testimony usually requires at least one student to make sure she doesn't fall but can require as many as four students, one in front, one in back, and one on each side to assure Student's safety when going uphill to return to her classroom after recess.

---

[28] Transcript, Vol. IV., pgs. 283-91.

Exhibit A to Complaint

## DISCUSSION AND CONCLUSIONS OF LAW

### General Legal Principles

In general, the burden of proof is viewed as consisting of two elements: the burden of production and the burden of persuasion. Before consideration of the Parents' claims, it should be recognized that the burden of persuasion lies with the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005). Accordingly, the burden of persuasion, in this case, must rest with the Parent.

In the role of factfinders, special education hearing officers are charged with the responsibility of making credibility determinations of the witnesses who testify. See *J. P. v. County School Board*, 516 F.3d 254, 261 (4th Cir. Va. 2008). This hearing officer found each of the witnesses who testified to be credible in that they all testified to the facts to the best of their recollection; minor discrepancies in the testimony were not material to the issues to be determined and, in any event, were not deemed to be intentionally deceptive.

The weight accorded the testimony, however, is not the same as its credibility. Some evidence, including testimony, was more persuasive and reliable concerning the issues to be decided, discussed as necessary below. The documentation and testimony were sometimes conflicting, although the hearing officer does not necessarily find that any one witness was intentionally untruthful, these inconsistencies did play a role in the hearing officers' decisions. In reviewing the record, the testimony of all witnesses and each admitted exhibit's content were thoroughly considered in issuing this decision, as were the parties' post hearing briefs.

### Applicable Legal Principles

The IDEA requires the provision of a "free appropriate public education" (FAPE) to children who are eligible for special education services. 20 U.S.C. § 1412. FAPE consists of both

14

special education and related services. 20 U.S.C. § 1401(9); 34 C.F.R. § 300.17. Decades ago, in *Hendrick Hudson Central School District Board of Education v. Rowley*, 458 U.S. 176 (1982), the U.S. Supreme Court addressed these statutory requirements, holding the FAPE mandates are met by providing personalized instruction and support services that are reasonably calculated to benefit educationally from the instruction, provided that the procedures set forth in the Act are followed. The Third Circuit has interpreted the phrase "free appropriate public education" to require "significant learning" and "meaningful benefit" under the IDEA. *Ridgewood Board of Education v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999).

Districts meet the obligation of providing FAPE to eligible students through development implementation of an IEP that is "'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.' " *Mary Courtney T. v. School District of Philadelphia*, 575 F.3d 235, 240 (3d Cir. 2009) (citations omitted). Recently, the U.S. Supreme Court considered the application of the *Rowley* standard, and it observed that an IEP "is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Endrew F. v. Douglas County School District* RE-1, ___ U.S. ___, ___, 137 S. Ct. 988, 999, 197 L.Ed.2d 335, 350 (2017). The IEP must aim to enable the child to make progress. The essential function of an IEP is to set out a detailed individualized program for pursuing academic and functional advancement in all areas of unique need. *Endrew F.*, 137 S. Ct. 988, 999 (citing Rowley at 206-09) (other citations omitted). The *Endrew* court thus concluded that "the IDEA demands … an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 137 S. Ct. at 1001, 197 L.Ed.2d at 352.

Exhibit A to Complaint

*Endrew*, *Rowley*, and the IDEA make abundantly clear, the IEP must be responsive to the child's identified educational needs. See 20 U.S.C. § 1414(d); 34 C.F.R. § 300.324. However, a school district is not required to provide the "best" program, but rather one that is appropriate in light of a child's unique circumstances. *Endrew F*. In addition, an IEP must be judged "as of the time it is offered to the student, and not at some later date." *Fuhrmann v. East Hanover Board of Education*, 993 F.2d 1031, 1040 (3d Cir. 1993).

"The IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist*. RE-1, U.S. 137 S. Ct. 988, 994, 197 L. Ed. 2d 335 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988)). An IEP is a comprehensive program prepared by a child's "IEP Team," which includes teachers, school officials, the local education agency (LEA) representative and the child's parents. An IEP must be drafted in compliance with a detailed set of procedures. 20 U.S.C. § 1414(d)(1)(B). An IEP must contain, among other things, "a statement of the child's present levels of academic achievement," "a statement of measurable annual goals," and "a statement of the special education and related services to be provided to the child." Id. § 1414(d)(1)(A)(i). A FAPE, 24 as the IDEA defines it, includes individualized goals, "specially-designed instruction" and "related services." Id. § 1401(9). "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability"; "related services" are the support services "required to assist a child . . . to benefit from" that instruction. Id. §§ 1401(26), (29). A school district must provide a child with disabilities such special education and related services "in conformity with the [child's] individualized education program," or "IEP." 20 U.S.C. § 1401(9)(D).

16

Exhibit A to Complaint

When formulating an IEP, a school district "must comply both procedurally and substantively with the IDEA." *Rowley*, at 206-07 A procedural violation occurs when a district fails to abide by the IDEA's safeguard requirements. A procedural violation constitutes a denial of a FAPE where it "results in the loss of an educational opportunity, seriously infringes the parents' opportunity to participate in the IEP formulation process or causes a deprivation of educational benefits." *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 953 (9th Cir. 2010). A substantive violation occurs when an IEP is not "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," *Endrew F.*

Pursuant to Part B of the IDEA, states are required to provide a FAPE for all children with disabilities between the ages of three and twenty-one. 20 U.S.C. § 1412(a); 34 C.F.R. §300.300(a). In 1982, in Hendrick Hudson Dist. Bd. of Educ. v. Rowley, the U.S. Supreme Court addressed the meaning of FAPE and set forth a two-part analysis that must be made by courts and hearing officers in determining whether a school district has failed to provide FAPE as required by federal law. 458 U.S. 176, 206-07 (1982). Pursuant to Rowley, the first inquiry that a court or hearing officer must make is that of whether the State, i.e. local educational agency or district, has complied with the procedures set forth in the IDEA. Thereafter, it must be determined whether the IEP(s) developed pursuant to IDEA procedures was reasonably calculated to enable the student to make appropriate progress in light of his specific circumstances. Id.

## PROCEDURAL VIOLATIONS

Regarding the first inquiry, that of whether the District complied with the procedures set forth in the IDEA, this Hearing Officer notes that counsel for the Parent alleges only three violations in her Due Process Complaint. This Hearing Officer finds that all three allegations

17

qualify as procedural in nature. These allegations are: (1) That the District denied Student Access to the designated handicapped parking space closest to the school entrance; (2) that the District denied Student access to the school's playground during recess; and (3) the District failed to provide all occupational therapy and physical therapy minutes pursuant to Student's 2019-2020 and 2020-2021 IEPs.

Regarding the first alleged procedural violation, that of whether the District denied Student access to the designated handicapped parking space closest to the school entrance, it is the opinion of this Hearing Officer that there was no violation of FAPE. The District provided an appropriate alternative to Parent having to park in the designated parking space and walk Student into school each day. The Parent gets in the car line with everyone else, and the District provides a staff member (paraprofessional, teacher, etc.) to help Student out of the car and get her to the school building.[29] The Parent argues in her post hearing brief that this infringes on Student's dignity. This Hearing Officer disagrees. To the contrary, this process instills independence as Student is treated like all her non-disabled peers. The only exception is that she has assistance getting in and out of the car. This Hearing Officer understands Parent's desire to walk Student into school. However, there is nothing undignified about this process. This is not a procedural violation under IDEA. As this hearing officer lacks the authority to determine issues that may fall under the Americans with Disabilities Act (hereinafter, "ADA") and Section 504 of the rehabilitation act (hereinafter, "Section 504"), my decision only applies to whether the District violated IDEA in denying Parent the right to park in a designated handicapped parking space, and in no way interferes with Parent's right to proceed in a different court under the ADA or Section 504.

---

[29] Trial Transcript, Vol IV., pgs. 119-120.

Exhibit A to Complaint

Regarding the second alleged procedural violation that the District denied Student access to the school's playground during recess, it is this Hearing Officer's opinion that this was a procedural violation under IDEA.   Under IDEA, an IEP includes the following: (1) a statement of the child's present academic achievement and functional performance; (2) a statement of measurable academic and functional goals; (3) a description of how a child's progress towards meeting goals will be measured; (4) a statement of the special education and related services, and supplementary aids and services that will be provided for the child; (5) an explanation of the extent, if any, to which the child will not participate with nondisabled children in regular classes and activities; and (6) a statement of individual, appropriate accommodations necessary to measure academic achievement and functional performance on state and district-wide assessments. 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(VI).  Recess is covered under the fourth item mentioned above.  This part of an IEP must also include a statement of program modifications or supports to be provided for the child to advance the student toward attaining annual goals, be involved in and make progress in the general curriculum, participate in extracurricular and other nonacademic activities, and be educated and participate with other children in activities. Id. The IDEA statute fails to define extracurricular and nonacademic activities, so we must look to the regulations.   34 C.F.R. 300.117, requires disabled students be educated to the maximum extent appropriate, with nondisabled students, including participating in extracurricular and nonacademic activities and receiving necessary supplementary aids and services for such participation.  Section 300.117 states:

> In providing or arranging for the provision of nonacademic and extracurricular services and activities, including meals, recess periods, and the services and activities set forth in § 300.107, each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child. The public agency must ensure that each child with a disability has the supplementary aids and services determined by the child's

IEP Team to be appropriate and necessary for the child to participate in nonacademic settings.

Furthermore, section 300.107 requires a school district to take steps to provide those supplementary aids and services that have been determined appropriate and necessary by the IEP team to afford the disabled student an equal opportunity to participate in extracurricular and nonacademic activities. Recess is a requirement under Arkansas law.[30] The following exchange occurred when the principal was asked about Student's access to the playground:

| Q by attorney | There has been testimony that there is no access for XXXX to the playground. Is that accurate? |
| A by Principal Wilson | Yes. |
| Q by attorney | Okay. And why is that, that there is no access? In 2021 for a kid that has got a walker, that there is no access? |
| A by Principal Wilson | I can't answer that[31] |

Principal Wilson went further and stated that for the past two years she has known of at least two students (including Student in this case) who were unable to access the playground.[32]

When a student such as the Student in this case, has a disability that severely limits her mobility, and the playground Student is to access during recess is not accessible, the IEP team should meet and discuss which supplementary aids and services are appropriate and necessary for the student to participate in the extracurricular and nonacademic activities. That did not happen in this case. We know from the testimony that Parent attempted to address her concerns with the Superintendent, the principal and the IEP team. The Superintendent testified that Parent had

---

[30] Ark. Code Ann. §6-16-102(a)(5)(A) states (5)(A) At least forty (40) minutes of instructional time per school day shall be used for recess during the school day for students attending public elementary schools. Ark. Code Ann. §6-16-102(B)(iii) states recess shall (iii) Include without limitation opportunities for free play and vigorous physical activity, regardless of whether recess occurs indoors or outdoors.
[31] Trial Transcript, Vol. IV., Pg. 19.
[32] Id., at 20.

Exhibit A to Complaint

talked with him in 2017 about getting a table for Student to sit at during recess.[33] A picnic table is

what the Superintendent provided Student.  There is no evidence that the IEP team ever

discussed providing any supplementary aids and services to help student participate in recess.

Instead, they surrounded Student with other 2nd and 3rd grade students, as Student used her

walker to go up and down the steep incline and hoped for the best.  This was a procedural

violation of IDEA.

Regarding the third alleged procedural violation, that the District failed to provide all

necessary occupational therapy and physical therapy minutes pursuant to Student's 2019-2020

and 2020-2021 IEPs.

**Student's 2019-2020 IEP**

According to Student's 2019-2020 IEP, Student was to receive 60 minutes a week of

Occupational therapy and 120 minutes a week of Physical therapy.[34]  There are 36 weeks in a

school year.  Therefore, Student was entitled to 2,160 minutes of Occupational Therapy and

4,320 minutes of Physical Therapy during the 2019-2020 school year.  Based on the Therapy

logs, and testimony presented at the hearing, the Hearing Officer finds that Student only received

1,500 minutes of occupational therapy, and 2,685 minutes of Physical Therapy.[35]  During the

2019-2020 school year Student missed around 11 hours of occupational therapy and

approximately 27 hours of physical therapy.[36]  Additionally Student qualified for Extended

school year services that included 60 minutes per week of physical therapy, and 60 minutes per

---

[33] Id., at 167/
[34] Parent's Exhibits, p. 52.
[35] Parent's Exhibits, pgs. 318-344, pgs. 427-474.
[36] Id.

Exhibit A to Complaint

week of occupational therapy.[37]  This hearing officer is of the opinion that this is a procedural violation under IDEA.


**Student's 2020-2021 IEP**

According to Student's 2020-2021 IEP, Student was to receive 60 minutes a week of Occupational therapy and 120 minutes a week of Physical therapy. [38] Based on the Therapy logs, and testimony presented at the hearing, Student was entitled to 2,160 minutes of occupational therapy and 4,320 minutes of physical therapy.  The Hearing Officer finds that Student only received 1,500 minutes of occupational therapy, and 2,685 minutes of Physical Therapy during the 2020-2021 school year.[39]  Student missed approximately, 5.5 hours of occupational therapy, and 13 hours of physical therapy during the 2020-2021 school year. This hearing officer finds this is a procedural violation under IDEA.


**Conclusion**

Having considered Parent's allegations of procedural due process violations, and in light of the findings and conclusions *supra*, it is the conclusion of this Hearing Officer that District procedurally violated the IDEA by (1) denying Student access to the school's playground during recess; and (2) failing to provide all occupational therapy and physical therapy minutes pursuant to Student's 2019-2020 and 2020-2021 IEPs.  The District however did not commit any procedural violations with regard to its denial of access to the designated handicapped parking space closest to the school entrance.

---

[37] Id. at pg. 18.
[38] Id. at pg. 20.
[39] Parent's Exhibits, pgs. 290-313, 361-423.

Exhibit A to Complaint

## SUBSTANTIVE VIOLATIONS OF IDEA

Having analyzed the first prong of the FAPE analysis, specifically that of procedural violations, and determined that the District denied Student access to the school's playground during recess and failed to provide all occupational therapy and physical therapy minutes pursuant to Student's 2019-2020 and 2020-2021 IEPs, it is now necessary to consider whether these procedural violation resulted in a substantive denial of FAPE to Student. Even if a school district violated IDEA procedures, it does not automatically follow that the school district has denied the child a FAPE.  K.E. v. Indep. Sch. Dist. 15, 647 F.3d 795, 804 (8th Cir. 2011).  Rather, a school district's educational plan for a given student will only be set aside for IDEA procedural violations "if the procedural inadequacies compromised the pupils right to an appropriate education, seriously hampered the parent's opportunity to participate in the formulation process or caused a deprivation of educational benefit." Id. At 804-805. Here, as discussed above, the District failed to even consider supplementary aids and services for Student to access the playground during nonacademic recess.  Truth is from the testimony and document presented, the District didn't discuss Student's access to any nonacademic activities during the IEP meetings, nor did they document any supplementary aids and services Student might need in order to access nonacademic activities. The Parent brought Students lack of access to the playground to the attention of the superintendent and the principal, and that was met with the District providing a picnic table for student to sit at during recess.[40]  Student has two 20-minute recesses throughout her school day.  One after lunch, which testimony was that the slope was not as steep where Student had to traverse down to get to the playground from the cafeteria. However, the distance Student must travel to get to the swings, the one piece of playground equipment she can access once she gets there is significant.  While most students can get to the

---

[40] Trial Transcript, Vol. IV., pgs. 167-168.

Exhibit A to Complaint

playground equipment within probably 4-5 minutes, it would appear to take Student much longer, which restricts her recess time significantly. Student's afternoon recess is from her classroom and the hill she has to traverse down appears quite steep from the pictures. According to the testimony, this is when Student would need up to four students to assist her in order for her to safely get up and down the incline. Again, all the while Student is manipulating a walk on an uneven surface of dirt and grass. Here, Student's access to her educational program which includes nonacademic activities, was compromised. I find this denial amounts to a substantive denial of FAPE by the District.

As for the District's failure to provide all occupational therapy and physical therapy minutes pursuant to Student's 2019-2020 and 2020-2021 IEPs. The number of minutes is not nominal as the District argues in its post hearing brief. Student has Cerebral Palsy. Cerebral Palsy is the most common motor disability in childhood. Cerebral means having to do with the brain. Palsy means weakness or problems with using the muscles. Walkers can assist children with cerebral palsy with their mobility issues. Student uses a walker to and from her classroom and to transition from her classroom to nonacademic activities such as cafeteria, music room, computer room, library, art room, recess, etc. Testimony was that Student has significant issues on her left side. This includes difficulty using her leg, arm and hand on that side of her body. This can cause difficulty for Student doing simple tasks such as hold a sheet of paper with one hand and writing on it with the other hand. Student needs both physical therapy and occupational therapy to help learn skills she needs to do academic work, and to be able to ambulate around obstacles she faces every day. As noted above, both Student's Physical Therapist, and Occupational therapist discuss in their evaluations that Student needs these services to access her educational program. Student was entitled to 2,160 minutes of

Exhibit A to Complaint

Occupational Therapy and 4,320 minutes of Physical Therapy during the 2019-2020 school year. Student only received 1,500 minutes of occupational therapy, and 2,685 minutes of Physical Therapy.[41] During the 2019-2020 school year Student missed around 11 hours of occupational therapy and approximately 27 hours of physical therapy. Additionally, during the 2020-2021 school year Student failed to receive, approximately 5.5 hours of occupational therapy, and 13 hours of physical therapy stated in her IEP. For a different Student with a different diagnosis this amount of time may not rise to the level of a substantive violation of IDEA. But for this Student whose physical access to her entire program rest with the positive results occupational and physical therapy can provide, this Hearing Officer finds this a substantive violation of FAPE. Thus, for the foregoing reasons, Student's 2019-2020 and 2020-2021 IEPs denied student a FAPE.

## Conclusion

The results of the testimony and evidence warrant a finding for the Parents. Specifically, Parents introduced sufficient evidence in the record to establish by preponderance of the evidence that District denied Student a FAPE between August 19, 2019, to April 15, 2021. District is hereby ordered to take the following actions regarding Student:

1. District is ordered to provide Student compensatory education in the amount of 40 hours or 2400 minutes of physical therapy and 16.5 hours or 990 minutes of occupational therapy. The minutes of therapy will be spread over time and agreeable to the District and Parent, taking into account Student's ability to endure additional therapies. The therapy minutes ordered will be carried forward on Student's IEP until completed.

---

[41] Parent's Exhibits, pgs. 318-344, pgs. 427-474.

Exhibit A to Complaint

2.       District is ordered to hold an IEP meeting within 30 days of this decision to develop an appropriate IEP for Student. The District LEA must be present.  The IEP team must discuss Student's access to District's campus and nonacademic activities, including but not limited to recess.   The IEP team must consider supplementary aids and services that may be appropriate and necessary to afford Student an equal opportunity to participate in extracurricular and nonacademic activities and document those decisions on Student's IEP.  The IEP team must also determine if additional evaluations are necessary in order to develop an appropriate program for Student.

3.       For the 2021-2022 school year the District shall hold quarterly IEP meetings to review Student's progress. District shall ensure the necessary participants attend Student's IEP meetings.  When discussing academic/nonacademic services that involve Occupational therapy and/or Physical therapy services, the District shall ensure that the occupational therapist and the physical therapist attend the IEP meeting.

Parents also allege that the District's conduct constitutes disability discrimination in Violation of §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a), and Title II of the Americans with Disabilities Act, 42 U.S.C. §12131-12165. This Hearing Officer has no jurisdiction over disability discrimination claims. See ADE Spec. Ed. Rules §10.01.22.1. Accordingly, to the extent Parents' due process complaints raise disability discrimination claims, those claims are dismissed.

Exhibit A to Complaint

**Finality of Order and Right to Appeal:**

The decision of this Hearing Officer is final.  A party aggrieved by this decision has the right to file a civil action in either Federal District Court or a State Court of competent jurisdiction, pursuant to the Individuals with Disabilities Education Act, within ninety (90) days after the date on which the Hearing Officer's Decision is filed with the Arkansas Department of Education.

Pursuant to Section 10.01.36.5, Special Education and Related Services:  Procedural Requirements and Program Standards, Arkansas Department of Education 2008, the Hearing Officer has no further jurisdiction over the parties to the hearing.

**IT IS SO ORDERED.**

*Dana McClain*
**HEARING OFFICER**

  8/16/2021
**DATE**

Exhibit A to Complaint