## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**C.W. and B.W., Individually**
**and as Parents and Next Friend of D.R.**                    **PLAINTIFFS**

**v.**                          **NO. 2:21-cv-00163-BSM**

**PALESTINE-WHEATLEY SCHOOL DISTRICT**          **DEFENDANT**

**JOHN ESTES, Individually**                    **DEFENDANT**

### <u>FIRST AMENDED COMPLAINT</u>

C.W. and B.W., Individually and as Parents and Next Friend of D.R., for

their First Amended Complaint state:

### <u>Parties</u>

1.      D.R., age 11, is a child with a disability as defined by the Individual

with Disabilities Education Act ("IDEA"), 20 U.S.C. §1401(3)(A)(i). D.R. has

Cerebral Palsy. She walks using a walker. D.R. has significant issues using the left

side of her body that cause difficulty with simple tasks such as holding a sheet of

paper with one hand and writing with the other. She requires occupational therapy

and physical therapy to access her educational program. **Exhibit A, p. 24**.

2.      C.W. is the biological mother of D.R.

3.      B.W. is the biological grandmother of D.R. D.R. lives with B.W., and

B.W. acts as D.R.'s primary caregiver. This makes B.W. D.R.'s "parent" as

defined by the IDEA. *See* 20 U.S.C. §1401(23)(C).

4.     Accordingly, C.W. and B.W. will be collectively referred to as "Parents."

5.     B.W. and D.R. reside Lee County, Arkansas.

6.     The Palestine-Wheatley School District ("PWSD") is an Arkansas school district and a public corporation that may be sued in its own name. *See* Ark. Code Ann. §6-13-102(a). Arkansas school districts are not state agencies immune from suit pursuant to the Eleventh Amendment. *See Herts v. Smith*, 345 F.3d 581, 588 (8th Cir. 2003).

7.     Jon Estes is PWSD's Superintendent and is sued in his individual capacity.

## Summary of Claims

8.     Plaintiffs assert three claims. First, Parents seek to recover their attorneys' fees and costs as the prevailing party in three consecutive IDEA due process hearings. *See* 20 U.S.C. §1415(i)(3)(B)(i).

9.     Second, Parents and D.R. seek injunctive relief and compensatory damages pursuant to §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a) ("§504"), and Title II of the Americans' with Disabilities Act, 42 U.S.C. §12131-12165 ("Title II") for disability discrimination because PWSD acted in bad faith by being deliberately indifferent to D.R.'s rights under the IDEA, §504, and Title II to accessible facilities and because PWSD retaliated against Parents and D.R.

2

10. Finally, Parents and D.R. seek to recover compensatory and punitive damages from Estes for retaliating against Parents and D.R. in violation of the First and Fifth Amendments of the U.S. Constitution.

## Jurisdiction and Venue

11. This Court has jurisdiction over Parents' IDEA fee claim pursuant to 20 U.S.C. §1415(i)(3)(A).

12. This Court has jurisdiction to award Parents and D.R. injunctive relief and compensatory damages for disability discrimination, including retaliation, pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a), §504, and/or Title II.

13. This Court has jurisdiction to award Parents and D.R. compensatory and punitive damages for Estes's First Amendment retaliation pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(a), and/or 42 U.S.C. §1983.

14. This Court is the proper venue for Plaintiffs' claims. *See* 28 U.S.C. §1391(b). Parents and D.R. reside in Lee County, Arkansas. PWSD is located in St. Francis County. The events giving rise to Plaintiffs' Complaint occurred in St. Francis County. Lee and St. Francis counties are in the Eastern District of Arkansas, Delta Division. *See* 28 U.S.C. §83(a)(2).

## Statement of Facts

15. On April 14, 2021, Parents filed a due process complaint with the Arkansas Department of Education ("ADE") alleging PWSD denied D.R. a free

3

appropriate public education ("FAPE") in the least-restrictive environment ("LRE") in violation of the IDEA.

16.     ADE numbered Parents' due process complaint as H-21-32 and assigned the case to an impartial due process hearing officer ("HO").

17.     The HO conducted a due process hearing over four days starting June 23, 2021 and ending on June 30, 2021. Ten witnesses testified at the hearing. Parents submitted two volumes of exhibits totaling 528 pages. PWSD submitted three volumes of exhibits totaling 940 pages.

18.     On August 16, 2021, the HO issued her Final Decision and Order in H-21-32 finding that PWSD denied D.R. a FAPE from August 19, 2019, to April 15, 2021. The HO's decision in H-20-32 (redacted) is attached hereto as **Exhibit A** and incorporated by reference pursuant to Rule 10(c) of the Federal Rules of Civil Procedure.

19.     The HO found that PWSD violated D.R.'s clearly established rights under the IDEA, §504, and Title II.

20.     First, PWSD acted with deliberate indifference to D.R.'s right to access the playground at school and other facitlities. The HO included in her opinion the following exchange:

> Q by attorney: There has been testimony that there is no access for [D.R.] to the playground. Is that accurate?
>
> A by Principal Wilson: Yes.

Q by attorney: Okay. And why is that, that there is no access? In 2021 for a kid that has got a walker, that there is no access?

A by Principal Wilson: I can't answer that.

**Exhibit A, p. 20 (citing Tr. H-21-32, Vol. IV, p. 19)**.

21.    Estes admitted that Parents complained about D.R. *not* having access to the playground in 2017 and about D.R. being required to sit on the ground to watch her peers play. Rather than making the playground accessible, Estes provided D.R. with a place to sit to watch her peers play. Estes made no plans to make the playground or any other facilities accessible by D.R. *See* **Exhibit A, pp. 20-21**.

22.    Second, PWSD acted with deliberate indifference to D.R.'s right to receive related services in conformity with her Individualized Education Program ("IEP"). *See* 20 U.S.C. §1401(9) (definition of FAPE).

23.    During the 2019-2020 school year, PWSD denied D.R. approximately 11 hours of occupational therapy and 27 hours of physical therapy. The HO found this violated the IDEA. **Exhibit A, p. 21**.

24.    During the 2020-2021 school year, PWSD denied D.R. approximately 5.5 hours of occupational therapy and 13 hours of physical therapy. The HO found this violated the IDEA. **Exhibit A, p. 22**.

25.     The HO concluded PWSD's failure to provide D.R. therapy in conformity with her IEP resulted in "a substantive violation of FAPE" because D.R's "physical access to her entire program rest with the positive results occupational therapy and physical therapy can provide." **Exhibit A, p. 25**.

26.     The HO ordered PWSD to take the following actions:

1. District is ordered to provide Student compensatory education in the amount of 40 hours or 2400 minutes of physical therapy and 16.5 hours or 990 minutes of occupational therapy. The minutes of therapy will be spread over time and agreeable to the District and Parent, taking into account Student's ability to endure additional therapies. The therapy minutes ordered will be carried forward on Student's IEP until completed.

2. District is ordered to hold an IEP meeting within 30 days of this decision to develop an appropriate IEP for Student. The District LEA must be present. The IEP team must discuss Student's access to District's campus and nonacademic activities, including but not limited to recess. The IEP team must consider supplementary aids and services that may be appropriate and necessary to afford Student an equal opportunity to participate in extracurricular and nonacademic activities and document those decisions on Student's IEP. The IEP team must also determine if additional evaluations are necessary in order to develop an appropriate program for Student.

3. For the 2021-2022 school year the District shall hold quarterly IEP meetings to review Student's progress. District shall ensure the necessary participants attend Student's IEP meetings. When discussing academic/nonacademic services that involve Occupational therapy and/or Physical therapy services, the District shall ensure that the occupational therapist and the physical therapist attend the IEP meeting.

**Exhibit A, pp. 25-26**.

27.    On June 29, 2021, Parents filed a second due process complaint with ADE alleging PWSD denied D.R. a FAPE in the LRE in violation of the IDEA.

28.    ADE numbered Parents' due process complaint as H-21-39 and assigned the case to an HO.

29.    The HO conducted a due process hearing over two days September 28-29, 2022. Six witnesses testified at the hearing. Parents submitted two volumes of exhibits totaling 226 pages.

30.    On November 14, 2022, the HO issued her Final Decision and Order in H-21-39 finding that PWSD denied D.R. a FAPE from April 16, 2021 to June 29, 2021. The HO's decision in H-21-39 (redacted) is attached hereto as **Exhibit B** and incorporated by reference pursuant to Rule 10(c) of the Federal Rules of Civil Procedure.

31.    The HO awarded Parents, among other things, reimbursement of out-of-pocket expenses, including mileage, for a physical therapy evaluations and services during the summer of 2021 through June 29, 2021 and compensatory physical therapy of 120 minutes per week for the same time period. **Exhibit B, p. 30**.

32.     On October 7, 2022, Parents filed a third due process complaint with ADE alleging PWSD denied D.R. a FAPE in the LRE in violation of the IDEA.

33.     ADE numbered Parents' due process complaint as H-23-17 and assigned the case to an HO.

34.     The HO conducted a due process hearing over four days November 17, 2022 and ending on December 19, 2022. Seven witnesses testified at the hearing. Parents submitted two volumes of exhibits totaling 496 pages.

35.     On February 8, 2023, the HO issued her Final Decision and Order in H-23-17 finding that PWSD denied D.R. a FAPE from June 30, 2021 to October 7, 2022. The HO's decision in H-23-17 (redacted) is attached hereto as **Exhibit C** and incorporated by reference pursuant to Rule 10(c) of the Federal Rules of Civil Procedure.

36.     The HO awarded Parents, among other things, reimbursement of out-of-pocket expenses, including mileage, for a physical therapy evaluations and services from June 30, 2021 to the start of the 2021-2022 school year; an occupational therapy evaluation; a access evaluation; and, two hours a week of compensatory education in reading and math. **Exhibit C, p. 38**.

**<u>Count I: IDEA Attorneys' Fees and Costs</u>**

37.      Parents are the prevailing party in a proceeding under the IDEA and may be awarded reasonable attorneys' fees and costs. *See* 20 U.S.C. §1415(i)(3)(B)(i).

38.      A party aggrieved by an HO's decision has 90 days to appeal. *See* 20 U.S.C. §1415(i)(2)(B) (90 days to appeal).

39.      PWSD's appeal time has run on the HO's decisions in H-21-32 and H-21-39. These are now final orders with preclusive effect under the doctrines of issue preclusion and law-of-the-case.

40.      PWSD's appeal time will run in H-23-17 will run on May 9, 2023.

41.      The IDEA does not establish a limitations period for an IDEA fee claim. *See* 20 U.S.C. §1415(i)(3). The Eighth Circuit has established a 90-day limitations period that starts when the losing party's time to appeal runs out, or 180 days from the HO's decision. *See Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 875-76 (8th Cir. 2020), cert. denied, 141 S. Ct. 2851 (2021); 20 U.S.C. §1415(i)(2)(B) (90 days to appeal).

42.      Plaintiffs timely filed their Complaint (Doc. No. 1) seeking attorneys' fees in H-21-32 on December 7, 2021.

43.      Plaintiffs file this First Amended Complaint within 180 days of

9

the HO's decisions in H-21-39 and H-23-17.

44.     This Court must give the HO's final orders the same preclusive effect that it would be entitled to in Arkansas courts because the HO was acting in a judicial capacity, the questions litigated were properly before the HO, and the parties had an adequate opportunity to litigate them. *See Univ. of Tennessee v. Elliott*, 478 U.S. 788, 799 (1986); *Plough v. West Des Moines Community School Dist.,* 70 F.3d 512, 515–16 (8th Cir.1995).

45.     ADE's rules establish that the HO acted in a judicial capacity. For example, the rules define "hearing officer" as "an impartial, trained individual assigned by [ADE], Special Education Unit, for the purpose of presiding at a due process hearing or expedited due process hearing." ADE Spec. Ed. Rules §10.01.21.1. *See* 20 U.S.C. §1415(f)(3)(a) (minimum qualifications for hearing officers). The rules ultimately require hearing officers to produce a "written judgment" including "findings of fact," and "the decision(s)" and "orders resulting from the hearing decision." ADE Spec. Ed. Rules, §10.01.39.2. *See* 20 U.S.C. §1415(h)(4) (requiring written findings of fact and decisions). Therefore, the HO clearly acted in a judicial capacity.

46.     ADE rules also make clear that the questions litigated were properly before the HO. The rules grant hearing officers authority:

> [T]o rule on any matter that pertains to the identification, evaluation
> or educational placement of a child with a disability, and the provision
> of a free appropriate public education to the child within the meaning
> of the IDEA and Ark. Code Ann. 6-41-202, *et seq.*

ADE Spec. Ed. Rules §10.01.22.1. Notably, PWSD did not challenge to the HO's

jurisdiction. The HO's decisions outline the questions litigated, and those questions

clearly fall within the HO's broad jurisdiction to ensure IDEA compliance. **Exhibit**

**A, p. 2; Exhibit B, p. 2; Exhibit C, p. 2**. Therefore, there can be no dispute that

the questions litigated were properly before the HO.

47.     Finally, the parties had an adequate opportunity to litigate the questions

presented. ADE's rules guaranteed the parties were afforded due process. They

provide:

> Any party to a hearing under these procedures has the right to –
>
> A. Be accompanied and advised by counsel and by individuals with
> special knowledge or training with respect to the problems of
> children with disabilities;
>
> B. Present evidence and confront, cross-examine, and compel the
> attendance of witnesses;
>
> C. Prohibit the introduction of any evidence at the hearing that has not
> been disclosed to that party at least five (5) business days before the
> hearing;
>
> D. Obtain a written, or, at the option of the parents, electronic,
> verbatim record of the hearing; and
>
> E. Obtain written, or, at the option of the parents, electronic findings
> of fact and decisions.

ADE Spec. Ed. Rules 10.01.14.1. At the hearings, the HO allowed PWSD to present all the evidence it wanted, to call all the witnesses it wanted, to cross-examine Parents' witnesses, and to submit a post-hearing brief before the HO ruled. Moreover, the HO placed the burden proof on Parents. **Exhibit A, p. 14; Exhibit B, p. 16; Exhibit C, p. 21**. Consequently, there can be no doubt that PWSD had an adequate opportunity to litigate the questions presented.

48.     Therefore, this Court must give the HO's decisions the same preclusive effect that a state court would. In Arkansas, an unreviewed administrative decisions may be given preclusive effect in later proceedings. *Alexander v. Pathfinder, Inc.*, 91 F.3d 59, 62 (8th Cir. 1996) (citing *Pine Bluff Warehouse v. Berry*, 51 Ark.App. 139, 142, 912 S.W.2d 11, 13 (1995)). "In Arkansas, issue preclusion bars relitigation of an issue of law or fact that was litigated in the first suit when the issue sought to be precluded is the same as that involved in the prior litigation, was actually litigated, determined by a valid and final judgment, and its determination was essential to the judgment." *Id*. (citing *Crockett & Brown, P.A. v. Wilson*, 314 Ark. 578, 581, 864 S.W.2d 244, 246 (1993)).

49.     Applying Arkansas law, issue preclusion bars PWSD from relitigating whether it denied D.R. a FAPE from August 19, 2019, to April 15, 2021. That

issue was actually litigated before the HO in H-21-32 and essential to the judgment.

50.     Applying Arkansas law, issue preclusion bars PWSD from relitigating whether it denied D.R. a FAPE from April 16, 2021, to June 29, 2021. That issue was actually litigated before the HO in H-21-39 and essential to the judgment.

51.     Applying Arkansas law, issue preclusion will bar PWSD from litigating whether it denied D.R. a FAPE from June 30, 2021, to October 7, 2022 if it does not appeal the HO's decision in H-23-17 wherein that issue was actually litigated and essential to the judgment. The District has until May 9, 2023 to appeal the HO's decision in H-23-17.

52.     Unappealed HO decisions are final judgments. *Alexander*, 91 F.3d at 62 ("Under Arkansas law, an unappealed administrative decision is a final judgment.") (citing *Pine Bluff Warehouse v. Berry*, 51 Ark.App. 139, 142, 912 S.W.2d 11, 13 (1995)).

53.     Accordingly, this Court must give the HO's final judgment preclusive effect under the doctrine of issue preclusion. *Id*.

54.     The Court may reach the same result applying the law of the case doctrine. "'[A] decision in a prior appeal is followed in later proceedings unless a party introduces substantially different evidence, or the prior decision is clearly erroneous and works a manifest injustice.'" *United States v. Bartsh*, 69 F.3d 864,

13

866 (8th Cir.1995) (quoting *United States v. Callaway*, 972 F.2d 904, 905 (8th Cir.1992) (per curiam)). PWSD cannot establish that the HO's decision was clearly erroneous or that application of the law of the case doctrine would work a manifest injustice. When PWSD decided not to appeal the HO's decision, it was conceding that it denied D.R. a FAPE from August 19, 2019, to April 15, 2021. Therefore, the law of the case doctrine also bars PWSD from relitigating that issue.

55.     Parents will submit a properly supported motion for summary judgment on their IDEA fee claim consistent with the Court's scheduling order.

### Count II: §504/Title II Disability Discrimination - General

56.     The enforcement, remedies, and rights were the same under §504 and Title II. *See Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 856 (8th Cir. 2000). Whether this is still true was called into question by the Supreme Court's decision in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 212 L. Ed. 2d 552, 142 S. Ct. 1562, 1576, reh'g denied, 213 L. Ed. 2d 1081, 142 S. Ct. 2853 (2022) ("[W]e hold that emotional distress damages are not recoverable under the Spending Clause antidiscrimination statutes we consider here.").

57.     D.R. is a qualified individual with a disability.

58.     PWSD is a public entity receiving federal funds.

59.     PWSD discriminated against D.R. solely on the basis of his disability.

14

60.     PWSD harmed D.R. by departing so substantially from accepted professional judgment, practice or standards as to demonstrate that the PWSD acted with wrongful intent.

61.     PWSD's decision to pursue a course of action knowing it would likely result in a violation of D.R.'s federally protected rights creates an inference that the District acted with deliberate indifferent. *See Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011).

62.     Since 2017, PWSD has known that D.R. was being denied access to the playground, bathrooms, and other facilities in violation her clearly established rights pursuant to the IDEA, §504, and Title II, but PWSD failed and refused to make its facilities accessible to D.R.

63.     "Congress sought primarily to make public education available to handicapped children" and "to make such access meaningful." *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 192, 102 S.Ct. 3034, 3043, 73 L.Ed.2d 690 (1982). Accordingly, the IDEA "makes specific provision for services, like transportation, for example, that do no more than enable a child to be physically present in class . . . ; and the [IDEA] specifically authorizes grants for schools to alter buildings and equipment to make them accessible to the handicapped." *Irving Ind. Sch. Dist. v. Tatro*, 468 U.S. 883, 891 (1984) (citing 20 U.S.C. §1406; see S.Rep. No. 94–168, p. 38 (1975), U.S.Code Cong. & Admin.News 1975, p. 1425; 121 Cong.Rec. 19483–

15

19484 (1975) (remarks of Sen. Stafford)).

64.     Pursuant to the IDEA, ADE developed "Program Standards" for

school district in Arkansas. ADE's program standards for academic facilities

provide:

> 17.01.1.1 Barriers that limit child[rens'] access to special education
> services must be eliminated.
>
> 17.01.1.2 Toilet areas, building and classroom entrances, etc., must
> conform to specifications for the accessibility of individuals with
> disabilities in conformance with the Americans with Disabilities Act,
> Public Law 101-336.
>
> 17.01.1.3 Classrooms should be located within an age-appropriate
> school building, which houses classrooms for nondisabled peers of
> children with disabilities.

ADE Spec. Ed. Rules, §17.01 Academic Facilities.

65.     Three provisions of the IDEA work to together to ensure that disabled

children have access to nondisabled peers: the least-restrictive environment

("LRE") requirement, the IEP requirement, and the transportation requirement.

66.     First, the LRE requirement provides:

> To the maximum extent appropriate, children with disabilities,
> including children in public or private institutions or other care
> facilities, are educated with children who are not disabled, and special
> classes, separate schooling, or other removal of children with
> disabilities from the regular educational environment occurs only
> when the nature or severity of the disability of a child is such that
> education in regular classes with the use of ***supplementary aids and
> services*** cannot be achieved satisfactorily.

20 U.S.C. §1412(a)(5) (emphasis supplied).

16

67.    The IDEA defines "supplemental aids and services" means:

*[A]ids, services, and other supports* that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate in accordance with Section 1412(a)(5) of this title.

20 U.S.C. §1401(33) (emphasis supplied).

68.    Therefore, the LRE requires school districts to provide the aids, services, and other supports necessary for a disabled child to access nondisabled peers.

69.    Second, the IDEA requires the IEP include:

[A] statement of . . . how the child's disability affects the child's involvement in and progress in the general education curriculum. §1414(d)(1)(A)(i)(I)(aa);

[A] statement of measurable annual goals . . . designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum. §1414(d)(1)(A)(i)(II)(aa);

[A] statement of measurable annual goals . . . designed to meet each of the child's other educational needs that result from the child's disability. §1414(d)(1)(A)(i)(II)(aa);

[A] statement of the special education and related services and *supplementary aids and services* . . .to be provided to the child, or on behalf of the child . . . to be involved in and make progress in the general education curriculum . . .  and to participate in extracurricular and other nonacademic activities; and to be educated and participate with other children with disabilities *and nondisabled children* . . . . §1414(d)(1)(A)(i)(IV)(bb), (cc);

17

> [A] statement of the ***program modifications or supports*** for school personnel that will be provided for the child to be involved in and make progress in the general education curriculum . . .  and to participate in extracurricular and other nonacademic activities; and to be educated and participate with other children with disabilities ***and nondisabled children*** . . . . §1414(d)(1)(A)(i)(IV)(bb), (cc).

(emphasis supplied). Therefore, the IEP must include the aids, services, modifications, and supports necessary for a disabled child to access nondisabled peers.

70.     In sum, the LRE requirement and the IEP requirement together require school districts to "take[] steps to accommodate the handicapped child in regular education," and if a school district fails to do so, it "is in violation of the [IDEA's] express mandate to supplement and modify regular education." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1013 (5th Cir. 2010).

71.     Consistent with the IDEA, ADE's special education rules provide:

> 17.02.1.1 Each public agency shall ensure that –
>
>> A. To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled; and
>>
>> B. Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

17.02.1.2 Determination of least restrictive environment is made on an individual basis, taking into account both service(s) needed and the placement in which the child's IEP can be implemented appropriately.

17.02.2 Continuum of alternative placements.

17.02.2.1 Each public agency must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services.

ADE Spec. Ed. Rules, §17.02 Least Restrictive Environment.

72.     ADE rules make clear that the LRE requirement also applies in nonacademic settings. The LRE rules provide:

In providing or arranging for the provision of nonacademic and extracurricular services and activities, ***including meals, recess periods***, and the services and activities set forth in 34 CFR 300.107, each public agency must ensure that each child with a disability participates with nondisabled children in the extracurricular services and activities to the maximum extent appropriate to the needs of that child. ***The public agency must ensure that each child with a disability has the supplementary aids and services determined by the child's IEP Team to be appropriate and necessary for the child to participate in nonacademic settings***.

ADE Spec. Ed. Rules, §13.04 (emphasis supplied). Moreover, ADE rules prohibit removing a disabled child from the regular classroom "solely because of needed modifications in the general education classroom." ADE Spec. Ed. Rules, §13.03.5.

73.     Finally, IDEA broadly defines "transportation" to ensure disabled children access to regular education classroom and nondisabled peers.

19

74.     Transportation is a related service under the IDEA. *See* 20 U.S.C.

§1401(26)(A). Federal rules define transportation to include:

(i) Travel to and from school and between schools;

(ii) Travel in and around school buildings; and

(iii) Specialized equipment (such as special or adapted buses, lifts, and ramps), if required to provide special transportation for a child with a disability.

34 C.F.R. §300.34. Therefore, the IDEA required PWSD to provide D.R.

transportation "in and around school buildings," including any needed

"[s]pecialized equipment." *See* 34 C.F.R. §300.34.

75.     Interpreting "in and around school buildings" consistent with the LRE

requirement, the PWSD was required to provide D.R. transportation to and from

"nonacademic and extracurricular services and activities, including meals, recess

periods," *see* ADE Spec. Ed. Rules, §13.04.

76.     Therefore, the IDEA required PWSD to provide D.R. transportation to

the playground equipment so she could have access to her nondisabled peers.

Moreover, PWSD must provide a transportation aide if necessary for D.R. to

receive a FAPE in the LRE. *See D.C. v. Ramirez*, 377 F. Supp. 2d 63, 68 (D.D.C.

2005) ("By denying C.G–R. a transportation aide, then, plaintiff falls short of the

IDEA's requirement that it provide C.G–R. a free appropriate public education, as

guaranteed by 20 U.S.C. § 1400(d)(1)(A).").

20

77. PWSD failed to make school field trips accessible for D.R. causing her to be left behind.

78. PWSD's conduct also violated D.R.'s clearly established rights pursuant to §504 and Title II. PWSD violated §504's regulations, 34 C.F.R. §104.21, that provides, "No qualified handicapped person shall, because a recipient's facilities are inaccessible to or unusable by handicapped persons, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity to which this part applies."

79. Moreover, PWSD's FAPE denial also violated §504. *See* 34 C.F.R. §104.33 (requiring a FAPE). *See also* 34 C.F.R. §104.37 (requiring "equal opportunity" to participate in "non-academic and extracurricular services and activities"); 34 C.F.R. §104.43 (prohibiting exclusion from "recreation").

80. Similarly, PWSD violated Title II's regulations, 28 C.F.R. §35.149 that provides, "[N]o qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity."

81. PWSD failed and refused to consider Darla's accessibility needs at IEP meetings. **Exhibit C, pp. 15-16**. Estes improperly predetermined that no

21

accessibility improvements would be made to PWSD's facilities.

82.     The HO found that PWSD witnesses who testified D.R.'s accessibility issues were addressed were *not* credible noting PWSD came forward with no documentation or other evidence to support this testimony. **Exhibit C, p. 29**. Estes encouraged these witnesses to offer false testimony knowing no accessibility improvements had been made.

83.     The HO noted that D.R.'s physical therapy evaluation documented D.R.'s "difficulty in navigating the school, participating in physical classes, and interacting during activities and recess." **Exhibit C, p. 29**.

84.     Similarly, the HO noted that D.R.'s occupational therapy evaluation documented that D.R. "is below average in overall fine motor control, fine motor integration, upper limb coordination, and manual dexterity." **Exhibit C, p. 30**.

85.     Finally, the HO noted that D.R. uses a walker and testimony established:

> [T]hat she has to traverse uneven sidewalks to get around campus, the playground is now safely accessible to Student, she must use stairs to get in the therapy building, must walk longer distance than other students to access a locker . . . and must navigate between six and ten non accessible doors just to get to her classed. Further, Student has to depend on other students or staff to assist her getting into bathroom stall as they are not accessible.

**Exhibit C, p. 30**.

86.     PWSD retained an expert to conduct an accessibility study. As

summarized by the HO, the study found "the campus is riddled with accessibility issues, including doors, bathrooms, sidewalks, playground, and stage." **Exhibit C, p. 30**.

87.     While the HO granted significant relief under the IDEA, the HO lacked jurisdiction to order PWSD to bring its facilities into compliance with §504/Title II. **Exhibit C, p. 30**. *See* ADE Spec. Ed. Rules §10.01.22.1 (HO jurisdiction).

88.     Accordingly, Parents respectfully request mandatory injunctive relief compelling PWSD to bring D.R.'s educational placement into compliance with 2010 Americans with Disabilities Act Standards for Accessible Design ("ADA Standards").

89.     The District's ongoing failure and refusal to build facilities and/or to bring its facilities into compliance with ADA standards substantially departs from accepted professional practices, and thus, constitutes bad faith and deliberate indifference to D.R.'s accessibility rights.

90.     Parents and D.R. also respectfully request that PWSD be ordered to pay D.R. compensatory damages based on alternative theories of recovery.

91.     First, D.R. seeks compensatory damages based on the lost opportunity to access her nondisabled peers. *See BRANDON MONTGOMERY, as personal representative for the estate of Gary Montgomery, Plaintiff, v. DISTRICT OF*

COLUMBIA, *Defendant*, No. CV 18-1928 (JDB), 2022 WL 1618741, *26 (D.D.C. May 23, 2022).

92.     Alternatively, D.R. seeks compensatory damages based on the benefit received but not earned by PWSD – it promised to comply with §504/Title II and make its facilities accessible but failed to do so. Under this traditional contract remedy, PWSD was unjustly enriched by receiving federal funding for promising to comply with §504/Title II when, in fact, it failed and refused to comply with §504/Title II.

93.     Accordingly, D.R. seeks compensatory damages in the form of restitution in an amount determined by a jury based on nature, extent, and duration of the disability discrimination against D.R. and the amount of federal funding received by Defendant during the time period covered. *See Cummings, id.* (§504 remedy limited to traditional contract damages); *Beck v. Inter City Transp., Inc.*, 2012 Ark. App. 370, 8, 417 S.W.3d 740, 745–46 (2012) ("It is basic contract law that where there is a material breach of a contract, substantial nonperformance, and entire or substantial failure of consideration, the injured party is entitled to rescission of the contract and restitution and recovery back of money paid."); H. Brill, Arkansas Law of Damages, p. 346-47 (6th Ed. 2014) ("In addition to these expectation damages, the injured party may also claim reliance damages and restitutionary awards. . . . In contract, a restitutionary award does not focus upon

24

the plaintiff's expected gains, nor does it focus upon the plaintiff's reliance losses; instead, the objective is to ascertain the benefit received by the defendant and require the defendant to account to the plaintiff for that gain. Recover for unjust enrichment is thus based upon what the person enriched has received rather than what the opposing party has lost. . .For example, in connection with, and reliance on a valid contract, a party may have made an advance payment to the other party; may have incurred expenses and made payments to a third party; and may have justifiable may have expected to make a profit on the contract. Following the breach, the victim may claim from the breaching party the advance payment made (restitution), the money paid to third parties (reliance), and the lost profits on the contract itself (expectation). All three elements may be consistently and simultaneously claimed.").

94.     According to ADE's Annual Statistical Report ("ASR"), PWSD received $1,356,007 in federal funding in 2021-2022 and $3,062,086 in 2020-2021. The ASR for the 2022-2023 school year is not yet available online. D.R. should be awarded some portion of federal funding received by PWSD as compensatory damages to prevent PWSD from being unjustly enriched by breaching its promise to comply with §504/Title II.

## Count III: §504/Title II Disability Discrimination - Retaliation

95.     Retaliation is prohibited disability discrimination. *Jackson v.*

*Birmingham Bd. of Educ.*, 544 U.S. 167, 173–74 (2005) ("Retaliation is, by definition, an intentional act. It is a form of 'discrimination' because the complainant is being subjected to differential treatment.").

96.     Retaliation is also prohibited by §504 and Title II rules. *See* 28 CFR § 35.134 (Title II); 34 CFR §104.61 (§504 - incorporates Title VI regs); 34 CFR §100.7(e) (Title VI).

97.     Parents engaged in protected activity by advocating for D.R.'s rights under the IDEA and §504/Title II in good faith.

98.     PWSD took adverse action against Parents and D.R. for their protected activity.

99.     PWSD prohibited B.W. from parking in the designated handicapped parking space when dropping D.R. off at school at the start of the 2020-2021 school year. Instead, PWSD ordered B.W. to park in a designated handicapped parking space in front of the Superintendent's Office requiring B.W. and D.R. to navigate a cracked, unlevel sidewalk to access school.

100.    On the first day of school, B.W. parked in front of the Superintendent's office, exited the vehicle, and then assisted D.R. exit the vehicle. D.R., leery of the long walk on her walker, asked B.W. to push her in the walker. As B.W. pushed D.R. over the cracked, unlevel sidewalk, she tripped and fell ending up on top of D.R.

101.    While neither was seriously injured, both were sore and bruised by

26

the fall. Immediately after the fall, they were too agitated and embarrassed to assess their injuries. B.W. knew she jammed her finger, but otherwise just wanted to move on. However, for days after the fall, B.W. had visible bruises on her knees, and both were achy and sore.

102.   On the following Monday, the Principal called B.W. and asked her to come the school for a meeting. B.W. complied. When B.W. entered the Principal's office, she expected an apology, but instead, the Principal lamented that she had been "jeered" by B.W.'s "fan club." Apparently, after B.W.'s fall, other parents observing the absurdity of the situation verbally berated the Principal.

103.   In the end, the Principal refused B.W.'s demand that she be allowed to park in the designated handicapped parking space in front of the school.

104.   B.W. appealed to the Superintendent, Estes. As a part of her appeal, B.W. showed Estes her bruised knees from her fall with D.R. Estes did not apologize, but instead, he sneered at Betty and said, "I'll call my lawyer." That was the end of their conversation. Estes ratified the decision of the Principal.

105.   The Principal ultimately allowed B.W. to stop in the designated handicapped parking space while school employee's rush D.R. out of the vehicle.

106.   The Principal's solution is unacceptable to B.W. because she has a *right* to park in a designated handicapped parking space, and neither the

Principal nor PWSD can take that right away for their own convenience.

107.   Moreover, allowing B.W. to park, help Darla exit the vehicle, and walk Darla into school better respects D.R.'s dignity, provides a more gradual transition into the school day, and allows them time to talk and make plans for during- or after-school activities. This routine gets D.R.'s day off to a good start.

108.   In contrast, PWSD personnel have been told to get D.R. out quickly to keep traffic moving. As soon as B.W. stops, they jerk the door open, grab D.R. and rush her out of the car in a fashion that causes D.R. to feel anxious and embarrassed by the resulting scene. This new routine meant every day got off to a bad start.

109.   PWSD, acting through Estes, also took adverse action against Parents and D.R. by failing and refusing to comply with §504/Title II in retaliation for Parents and D.R. filing due process complaints against PWSD.

110.   The PWSD Board of Directors ("Board") knew that Estes, acting as Superintendent, was failing and refusing to comply with §504/Title II in retaliation for Parents and D.R. filing due process complaints against PWSD, and terminated Estes as Superintendent on or about September 13, 2022.

111.   A Board member told the local newspaper that one reason Estes was terminated was "the special needs lawsuits." He said, "There was no reason to have those. They all could have been avoided, but he didn't do it." Times-Herald, *Palestine-Wheatley Board votes to fire superintendent* (September 14,

2022).

112.    Even if Plaintiffs general disability discrimination claim fails,
Plaintiffs can still prevail based on retaliation if they engaged in protected
activity in good faith. *See Rinehart v. Weitzell*, 964 F.3d 684, 689 (8th Cir.
2020). For example, even if the law allowed PWSD to prohibit B.W. from
parking in the designated parking space in front of the school, PWSD cannot
retaliate against B.W. for demanding to be allowed to park in that space because
the demand was made in good faith.

113.    A causal connection exists between Parents' and D.R.'s protected
activity and the adverse action taken by PWSD.

114.    Parents, individually, are "person[s] aggrieved" and have standing
to pursue a §504/Title II discrimination claim based on the PWSD's disability
discrimination against D.R. described herein. *See* 29 U.S.C. §794a(a)(2) ("The
remedies, procedures, and rights . . . shall be available to any person aggrieved
by any act or failure to act by any recipient of Federal assistance or Federal
provider of such assistance . . . "); 42 U.S.C. § 12133 (incorporating §794a);
*K.F. v. Francis Howell R-III Sch. Dist.*, No. 4:07CV01691 ERW, 2008 WL
723751, at *7 (E.D. Mo. Mar. 17, 2008) ("This Court is persuaded by the
reasoning in *Blanchard* and *C.J.G.*, and finds that parents do have standing under
Section 504 and the ADA as an aggrieved party in their own right.") (following
*Blanchard v. Morton Sch. Dist.*, 509 F.3d 934 (9th Cir. 2007) and *C.J.G. v.

*Scranton Sch. Dist.*, 2007 WL 4269816 at *5-6 (M.D. Pa. Dec. 3, 2007)).

115.   As a direct and proximate result of the PWSD's retaliation, Parents and D.R. have incurred and will incur in the future non-pecuniary losses for which they should be compensated.

116.   Parents and D.R. have suffered non-pecuniary losses in the form of past and future emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

117.   Parents respectfully requests compensatory damages for Parents' and D.R.'s non-pecuniary losses in an amount determined by a jury.

118.   Alternatively, D.R. seeks compensatory damages based on the benefit received but not earned by PWSD by promising to comply with §504/Title II. Under this traditional contract remedy, PWSD was unjustly enriched by receiving federal funding for promising to comply with §504/Title II when, in fact, it failed and refused to comply with §504/Title II. Accordingly, D.R. seeks compensatory damages in the form of restitution in an amount determine by a jury based on nature, extent, and duration of the disability discrimination against D.R. and the amount of federal funding received by Defendant during the time period covered.

## Count IV: First Amendment Retaliation

119.   Parents, individually and on behalf of D.R., seek relief pursuant to 42 U.S.C. §1983, from Estes, individually, for his retaliation against Parents and D.R.

30

in violation of their rights under the First and Fifth Amendments of the U.S.

Constitution.

120.   Parents engaged in protected activity by advocating for D.R.'s rights

under the IDEA and §504/Title II.

121.   Estes took adverse action against Parents and D.R. as described

above.

122.   Parents' protected activity was a motivating factor in Estes' decision

to take adverse action against Parents and D.R.

123.   At all relevant times, Estes acted under color of state law.

124.   As a direct and proximate result of the Estes' First Amendment

retaliation, Parents and D.R. have incurred and will incur in the future non-

pecuniary losses for which they should be compensated.

125.   Parents and D.R. has suffered non-pecuniary losses in the form of past

and future emotional pain, suffering, inconvenience, mental anguish and loss of

enjoyment of life.

126.   Parents respectfully requests compensatory damages for Parents' and

D.R.'s non-pecuniary losses in an amount determined by a jury.

127.   Estes' conduct in this case was motivated by evil motive or intent

and/or involved reckless or callous indifference to the federally protected rights of

Parents and D.R., and accordingly, Parents and D.R. should be awarded punitive

damages from Estes to punish Estes and to deter others from engaging in similar behavior.

### Jury Demand

128.   Plaintiffs demand a jury trial on Counts II, III, and IV.

WHEREFORE, Plaintiffs pray that Parents be awarded their attorneys' fees and costs and the prevailing party in proceedings under the IDEA; that the Court enter a mandatory injunction compelling PWSD to bring D.R.'s educational placement into compliance with ADA standards; that Parents and D.R. be awarded compensatory damages from PWSD for disability discrimination generally and retaliation in an amount determined by a jury; that Parents and D.R. be awarded compensatory and punitive damages from Estes for First Amendment Retaliation in an amount determined by a jury; and, that Plaintiffs be awarded all other just and proper relief to which they may be entitled.

Respectfully submitted,

Theresa L. Caldwell
Arkansas Bar Number 91163
Clay Fendley
Arkansas Bar Number 92182
Attorney for Plaintiffs
CALDWELL LAW OFFICE
14 Alban Lane
Little Rock, Arkansas 72223
Tel.: 501-414-0434
Email: tlcatty@gmail.com
Email: clay@specedattorney.com